692 A.2d 529

JEFFREY LEE MOURNING, PLAINTIFF–APPELLANT, AND ELD-
ER TOOTHAKER, PLAINTIFF, v. CORRECTIONAL MEDICAL
SERVICES, (CMS) OF ST. LOUIS, MISSOURI, ET AL.; ABC–
INDIVIDUAL(S) (UNKNOWN JOHN AND JANE DOES); DEF–
ENTITIES AND GHI CORPORATIONS (BEING FICTITIOUS
NAMES) ET AL.; DEBORAH PORITZ, ATTORNEY GENERAL
FOR THE STATE OF NEW JERSEY; AND STEVEN WEIN-
STEIN, ESQ., INDIVIDUALLY AND IN THEIR OFFICIAL CA-
PACITIES, DEFENDANTS, AND WILLIAM H. FAUVER, COM-
MISSIONER, NEW JERSEY DEPARTMENT OF CORRECTIONS
AND DONALD E. LEWIS, ADMINISTRATOR, RIVERFRONT
STATE PRISON, DEFENDANTS–RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued March 26, 1997—Decided April 25, 1997.

214

Before Judges KING, KEEFE and CONLEY.

*Frank Askin* argued the cause for appellant (*Constitutional Litigation Clinic*, attorney).

*Andrew R. Sapolnick,* Deputy Attorney General, argued the cause for respondents (*Peter Verniero,* Attorney General of New Jersey, attorney; *Joseph L. Yannotti,* Assistant Attorney General, of counsel; *R. Brian McLaughlin,* Deputy Attorney General, of counsel; *Mr. Sapolnick,* on the brief).

The opinion of the court was delivered by

KING, P.J.A.D.

## I.

This is an appeal from a denial of injunctive relief and grant of summary judgment in the State's favor in a prisoner's action challenging the New Jersey medical copayment statute. We reject appellant's constitutional challenge to the statutory scheme and affirm primarily for the reasons given by Judge Carchman in his oral opinion of May 20, 1996.

## II.

On November 1, 1995 the Legislature enacted *L.* 1995, *c.* 254, the prison inmate copayment statute (statute) codified as *N.J.S.A.* 30:7E-1 to -6, effective March 1, 1996, to partially defray the cost of inmates' health care and to reduce the incidence of overutilization and malingering among inmates in state and county correctional facilities.

*N.J.S.A.* 30:7E-2 provides in pertinent part:

a.  An inmate shall be liable for the cost of, and be charged a nominal fee for, any medical care, surgery, dental care, hospitalization or treatment provided to the inmate during the inmate's term of incarceration or detention by the State or a county. . . .

b. An inmate may be charged either the full cost of or a nominal fee for any prescription or nonprescription drug or medicine provided to the inmate during the inmate's term of incarceration or detention by the State or a county.

The statute provides that the State Treasurer will determine the amount of the "nominal fees" in accordance with guidelines promulgated by the Commissioner of the Department of Corrections (Commissioner) for inmates incarcerated or detained in a State correctional facility or a State-contracted half-way house, and by the county treasurer in accordance with guidelines promulgated by the county adjuster for inmates incarcerated or detained in a county jail. *N.J.S.A.* 30:7E–2(a), (b). *N.J.S.A.* 30:7E–4 allows the State or county to place a lien "on any and all property and income to which the person shall have or may acquire an interest," for fees charged to cover the cost of "any medical care, dental care, surgery, hospitalization or treatment provided by the State or the county," as well as "for the cost or any fee charged for the cost of any prescription or nonprescription drug or medicine." The Governor's press release anticipated savings of $600,000 annually for the Department of Corrections.

*N.J.S.A.* 30:7E–5 guarantees inmates unable to make copayments access to medical care; it states:

Notwithstanding the provisions of sections 2, 3 and 4 of this act, no inmate shall be denied medical care, surgery, dental care, hospitalization, treatment or prescription or nonprescription drugs or medicine because he is not covered under a health insurance plan or because the inmate is unable to reimburse the State or county for the costs of those services, drugs or medicine.

*N.J.S.A.* 30:7E–6 directs the Commissioner to promulgate regulations under the inmate copayment statute.

Pursuant to this directive, the Department of Corrections (DOC) circular HS–96–01 (DOC copayment system), established the "DOC policy for inmate copayment of eligible health and dental care treatment, while ensuring that all inmates will be provided the opportunity to receive necessary health care services regardless of their ability to pay." The copayment system requires the DOC to properly notify both inmates and staff of the copayment system's details. When seeking medical attention, the DOC copayment system requires inmates to complete a medical

request form (HS–01), which "informs the inmate that there may be a charge for services and that any charge assessed may be grieved." The medical department will then "complete a daily medical log HS–02 indicating all inmates seen for the day and whether or not the services received are chargeable and the chargeable amount." "In the event of emergency services the staff must initiate form HS–01 to document medical services received and the chargeable amount." The health care staff will also document on the medical request form the appropriate charge at the time a prescription is written. "Once the prescription is written and acknowledged, the account will be charged $1.00."

The copayment system imposes a $5 copayment on inmates for each inmate initiated visit for medical, dental, emergency and optometry services. Services *excluded* from the copayment requirement are:

1. Initial assessments [physical examinations] during the reception and classification process, classification physical and transfer evaluations, discharge physical examinations.

2. Prescribed laboratory work to include inmate requests for HIV testing.

3. Prescribed x-rays.

4. Immunizations, Tuberculosis (TB) testing, Hepatitis B vaccine, and other treatments instituted by NJDOC for public health reasons.

5. Prescribed psychiatric, psychological, substance abuse and social work services.

6. EKG's, dressing changes and other ongoing treatments ordered by health care staff. If treatment is prescribed over the course of several days or weeks, the inmate should not be charged for each visit.

7. Medical visits initiated by medical/mental health staff to comply with Department policy or regulations.

8. Provider scheduled follow-up visits related to the initial problem.

9. Written referrals from one provider to another.

10. Dental referrals made by health care staff.

These provisions govern copayments for prescriptions:

Regardless of whether it is dispensed to the inmate in quantity (Keep on Person) or by individual unit doses, all medical prescriptions will be ordered by qualified healthcare professionals in quantities and durations that are medically appropriate and in keeping with all applicable laws and regulations.

Orders for chronic maintenance medications will be written for as large a supply as possible, in accordance with the standards noted above. Whenever a healthcare professional is required to reevaluate, renew, refill, approve or rewrite a medication order, that transaction will be viewed as a new prescription chargeable to the respective inmate.

    a.   Each prescription ordered will have a $1.00 co-pay.

    b.   Each prescribed over the counter medication will have a $1.00 co-pay.

    c.   Some over the counter medications for personal elective use may be available in the canteen at full retail price.

Using copayment log forms (HS–02), medical personnel will record the appropriate copayment charge and forward the log forms to the business office. "Upon receipt, medical copayments will be charged to an inmate's account in accordance with Business Office procedures. Inmates will not be refused necessary medical treatment because of insufficient funds to cover the medical copayment."

Under the copayment statute, the DOC may only deduct costs from funds in excess of $15 in the inmate's account and may not deduct more than one-third of the inmate's total income from a productive institutional occupation, after deductions for assessments, restitution and fines. *See N.J.S.A.* 30:4–92 [1]; *N.J.A.C.*

---

[1] *N.J.S.A.* 30:4–92 states:

The inmates of all correctional and charitable, hospital, relief and training institutions within the jurisdiction of the State Board shall be employed in such productive occupations as are consistent with their health, strength and mental capacity and shall receive such compensation therefor as the State Board shall determine.

Compensation for inmates of correctional institutions may be in the form of cash or remission of time from sentence or both. Such remission from the time of sentence shall not exceed one day for each five days of productive occupation, but remission granted under this section shall in no way affect deductions for good behavior or [sic] provided by law.

*From moneys paid to inmates of correctional institutions, the superintendent of the institution shall withdraw sufficient moneys, in an amount not to exceed one-third of the inmate's total income, as may be required to pay any assessment, restitution or fine ordered as part of any sentence, and is authorized to withdraw from the remainder of the inmate's total income an amount not to exceed one-third of the total income as may be required to pay costs and fees charged or owing, pursuant to section 2 of P.L.1995, c. 254 (C. 30:7E–2).*

10A:2–2.2(f). Each inmate's account is credited with $15 at the beginning of each month, this is the inmate's personal budget for necessities. The DOC may not disturb the inmate's $15 necessity budget. If the inmate's account has insufficient funds to cover copayment charges, the inmate's account will carry an outstanding debit, and the DOC will deduct funds from the inmate's account as funds become available, subject to the one-third and $15 limitations of *N.J.S.A.* 30:4–92 and *N.J.A.C.* 10A:2–2.2(f), respectively.

## III.

On February 27, 1996 *pro se* plaintiffs Jeffrey Lee Mourning and Elder S. Toothaker, inmates at Riverfront State prison, filed this complaint, claiming that the copayment program is "arbitrary, capricious, unreasonable, illegal, and unconstitutional" because the State cannot enter into a privatization contract making plaintiffs third parties to the contract in violation of their due process and equal protection rights. Plaintiffs originally filed this claim as third-party plaintiffs in *Communications Workers of America (CWA) v. Correctional Medical Services (CMS)*, (MER–L–0862–96), a Mercer County Law Division action challenging the privatization of inmate medical services.

Plaintiffs sought a temporary restraining order, a declaration "voiding any contract between [CMS] and the New Jersey Department of Corrections that does not exempt indigent prisoners ...," a declaration that CMS or DOC "cannot enter into a contract that would effectively cause plaintiffs to become third-party-obligors thereto ... by implementing a law or policy that would effectively cause them to 'assume any or some of the responsibility' for the costs of needed medial treatment or prescriptions rendered by

---

In addition, all inmates classified as minimum security and who are considered sufficiently trustworthy to be employed in honor camps, farms or details shall receive further remission of time from sentence at the rate of three days per month for the first year of such employment and five days per month for the second and each subsequent year of such employment. [emphasis supplied.]

defendant," and a declaration that the copayment statute is in fact "illegal and unconstitutional because it effectively makes plaintiffs third-party-obligors to an already existing contract, without due process or equal protection under the laws."

Judge Carchman severed plaintiffs' action from the *CWA v. CMS* action. Defendants in this action opposed the claim for declaratory relief and moved to dismiss the complaint for failure to state a claim upon which relief can be granted. The judge "felt that it would be helpful not only to plaintiffs but certainly to the court as well if plaintiffs were represented in this matter." Mr. Askin of the American Civil Liberties Union (ACLU) of New Jersey then agreed to represent plaintiffs.

On April 3, 1996 Judge Carchman granted the ACLU's leave to appear as *amicus curiae*. Both the ACLU and the State submitted briefs and certifications. On April 3, 1996, the ACLU, submitted a certification of Robert L. Cohen, M.D., a member of the National Commission on Correctional Health Services and previously the Director of Montefiore Rikers Island Health Services, the primary jail for the New York City Department of Corrections. Cohen essentially concluded that imposition of the copayment program would impede inmates' access to medical services. Dr. Cohen explained that the copayment provision would have an effect on the general prison population, as it would on the public at large, because of the potential spread of contagious diseases and infections, as a result of inmates' failure to seek medical attention.

Dr. Cohen declared that,

Despite the policy of not "refusing" medical care to an inmate "due to an inability to pay," indigent inmates will still forego medical care when faced with Cost Sharing. Prisoners who cannot pay for services accrue a negative balance on their accounts for the medical services they receive. Subsequent deposits into their accounts are applied first against the negative balance. An indigent inmate is thus faced with the following dilemma: Request medical care and risk running a negative balance that may never be paid off, or forego medical care and apply whatever monies become available to non-medical personal needs.

In support of his position, Dr. Cohen cited "one major experiment, the Health Insurance Experiment ("HIE Study"), which examined specifically the effect of Cost Sharing on access to health care," and found it had generated an adverse affect on access to health care for poor people. Cohen also observed that "[t]he Congressional Office of Technical Assistance ("OTA") reviewed Cost Sharing, and the HIE Study, for Congress in 1993. OTA found that for poor people, Cost Sharing did function as a barrier to care."

On April 19, 1996 defendants submitted certifications of Dr. Dwight C. Hutchinson, Director of Medical Services for the New Jersey Department of Corrections, and Paul Rebovich, Chief of the Department's Bureau of Audits and Accounts. According to Dr. Hutchinson, the copayment program posed no threat to inmates' access to health care. Dr. Hutchinson based his opinion on his own experience and "accounts from other states associated with the National Commission on Correctional Health Care which have detailed their positive experiences with copayment programs without adverse effect on the quality or availability of the health care provided to inmates." Dr. Hutchinson noted that the DOC will only deduct medical expenses from an inmate's account if the account balance is in excess of $15. Dr. Hutchinson urged: "However, where an inmate does have available funds to pay, the choice that an inmate has to make between seeking medical attention and purchasing personal goods is no different than choices that are made by people in the community." Dr. Hutchinson explained that even where an inmate refused to seek medical attention, prison staff may initiate visits if inmates display signs of illness, such as tuberculosis, and these costs would not be subject to copayment.

Rebovich explained in his certification that under *N.J.S.A.* 30:4–92 "only one-third (1/3) of an inmate's [institutional] income (after payment of court ordered assessments) can be taken to satisfy the payment for medical care and services." Moreover, the DOC may only deduct medical expenses from an inmate's account which has

a balance in excess of $15. Mr. Askin, counsel for appellant, submitted a certification, dated April 25, 1996, with inmate certifications and letters attached, describing the adverse effect of the copayment program on particular inmates.

Defendants submitted post-hearing certifications of: Howard L. Beyer, Assistant Commissioner for the Division of Operations within the DOC; Deborah Raab, a Program Development Specialist with the New Jersey DOC Office of Institutional Support Services; Paul Rebovich; Thomas D. Farrell, Supervisor of DOC's Health Services Unit; and Andrew R. Sapolnick, a Deputy Attorney General assigned to the Federal Rights Litigation and Corrections Section of the Division of Law.

Beyer's certification, dated May 3, 1996, explained that enhanced measures were taken to notify the inmate population of the copayment program which had taken effect on April 1, 1996. Raab also explained in her certification that she conducted an informal survey of other states' inmate copayment policies and attached her findings to her certification. She noted that "fourteen (14) other states, assess inmates with a copayment for the costs associated with their medical care or have copayment policies pending. Inmates are charged anywhere from $2.00 to $10.00 for medical visits and in some states are charged $2.00 for pharmaceutical." Raab noted that some states, unlike New Jersey, charge for prosthetic devices and eyeglasses. Raab also attached a fee schedule chart indicating the copayments imposed by each county in New Jersey. Farrell stated that a memorandum, dated May 2, 1996, was sent to all state correctional institutions clarifying the medical copayment guidelines. The May 2, 1996 memorandum focused primarily on clarifying the prescription copayment provisions.

Judge Carchman rendered an oral opinion on May 20, concluding that the plaintiffs had not met the criteria for preliminary injunctive relief. He stated that "[i]t is up to the Legislature to determine who should bear the cost [of health care] where there is no primary insurer or where the person treated cannot be served."

According to the judge, "[i]n enacting the Inmate Copayment Statute, the Legislature has created new state law requiring inmates to help defray the cost of their health care. There is no constitutional bar *per se* to such an enactment, and the inquiry turns to whether that implementation unduly burdens any rights plaintiffs may have."

Judge Carchman found that the statute did not unduly burden an inmate's access to health care. He based his findings on the fact that (1) "medical services may not be withheld based upon an inmates' inability to pay," and (2) regulations and statutory provisions place other limitations on withdrawals from inmates' trust accounts, namely that "deductions are limited by statute and regulation to one third of an inmates' income, and funds over and beyond the minimal [exempt] balance of $15." He also found that "[w]ith an opportunity to grieve the issues raised by the form, plaintiffs' due process rights are protected" and that the record did not support the equal protection and *ex post facto* claims. The judge dismissed plaintiffs' claims against CMS and the Attorney General. Only plaintiff Mourning appeals.

## IV.

We review the ruling in the Law Division under the standard established in *Brill v. Guardian Life Ins. Co. of Am.*, 142 *N.J.* 520, 666 *A.*2d 146 (1995), where plaintiff filed a negligence claim against defendant life-insurance broker and his agency for "failing to advise a prospective insured of the possibility of securing immediate, temporary coverage upon completion of the application process." *Id.* at 523, 666 *A.*2d 146.

The *Brill* Court adopted the federal summary judgment standard stating that:

Under this new standard, a determination whether there exists a "genuine issue" of material fact that precludes summary judgment requires the motion judge to consider whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party. The "judge's function is not himself [or herself] to weigh the evidence and

determine the truth of the matter but to determine whether there is a genuine issue for trial." *Liberty Lobby, supra,* 477 *U.S.* [242] at 249, 106 *S.Ct.* [2505] at 2511, 91 *L.Ed.*2d [202] at 212. Credibility determinations will continue to be made by a jury and not the judge. If there exists a single, unavoidable resolution of the alleged disputed issue of fact, that issue should be considered insufficient to constitute a "genuine" issue of material fact for purposes of Rule 4:46–2. *Liberty Lobby, supra,* 477 *U.S.* at 250, 106 *S.Ct.* at 2511, 91 *L.Ed.*2d at 213. The import of our holding is that when the evidence "is so one-sided that one party must prevail as a matter of law," *Liberty Lobby, supra,* 477 *U.S.* at 252, 106 *S.Ct.* at 2512, 91 *L.Ed.*2d at 214, the trial court should not hesitate to grant summary judgment. [*Id.* at 540, 666 *A.*2d 146].

In *Brill,* defendant contended that the expert report submitted by its expert broker created a genuine issue of material fact regarding its negligence. *Id.* at 543, 666 *A.*2d 146. The expert broker had concluded that defendant broker was not negligent. *Ibid.* The *Brill* Court found however that the expert's "conclusion regarding Gould's liability is based on a factually inaccurate and unjustifiable assertion," essentially that the defendant broker had performed all of his duties in accordance with applicable standards and that the broker did not issue a conditional receipt because the potential insured refused to pay the entire premium. The Court noted that "[a]n expert's opinion of no negligence based on erroneous or nonexistent facts is worthless." *Id.* at 543–44, 666 *A.*2d 146. Moreover, "[a] party cannot defeat a motion for summary judgment merely by submitting an expert's report in his or her favor." *Id.* at 544, 666 *A.*2d 146.

Here we determine whether the Law Division judge properly granted summary judgment based on the standard in *Brill,* namely, whether a genuine issue of material fact existed which would preclude disposition by summary judgment as a matter of law for the defendants.

## V.

Appellant principally contends that the statute in its implementation, rather than facially, violates his right under the New Jersey State Constitution to reasonable healthcare or at a minimum that Dr. Cohen's assertions have created an issue of fact on

this point. *Right to Choose v. Byrne*, 91 *N.J.* 287, 303, 450 *A.*2d 925 (1982) (statute restricting medicaid funding to abortion necessary to save life of mother violated New Jersey Constitution).[2] We disagree on both counts. Dr. Cohen's somewhat apocalyptic vision of the breakdown of healthcare in the prison system with the advent of the copay statute does not require either a plenary hearing or our constitutional negation of this statutory scheme as a matter of law. At most, Dr. Cohen's analysis suggests that the statute may be substantively unwise or administratively cost-inefficient in comparison to the status quo of no copay and no prisoner contribution to health care. If we are to attribute scientific accuracy to Dr. Cohen's gloomy predication of breakdown in the prison healthcare-delivery system to the point of a threat to the constitutional right to bodily integrity, we must presume a complete failure of duty of prison management in the executive branch and an utter lack of self-interest in health care in the prison population. The present record does not justify our intervention to adjudicate such a constitutional claim.

Dr. Cohen's conclusion is based on the assumption that inmates may confront a dilemma between purchasing necessities and receiving medical treatment. Dr. Cohen urges that this could have an adverse effect on the individual inmate who will become ill for

---

[2] In *Right to Choose v. Byrne*, 91 *N.J.* 287, 303, 450 *A.*2d 925 (1982), the court stated:

In more expansive language than that of the United States Constitution, *Art.* I, par. 1 of the New Jersey Constitution provides: "All persons are by nature free and independent, and have certain natural and unalienable rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing, and protecting property, and of pursuing and obtaining safety and happiness." The state Bill of Rights, which includes that provision, has been described as expressing " 'the social, political, and economic ideals of the present day in a broader way than ever before in American constitutional history.' " Milmed, "The New Jersey Constitution of 1947" in *N.J.S.A. Const., Arts.* I–III 91 at 110 (1971). By declaring the right to life, liberty and the pursuit of safety and happiness, *Art.* I, par. 1 protects the right of privacy, a right that was implicit in the 1844 Constitution. Heckel, "The Bill of Rights," in II *Constitutional Convention of 1947*, 1336 at 1339 (1951).

failure to seek medical attention. Dr. Cohen also claims that the inmate's refusal to seek medical treatment might adversely affect the general prison population and the public at large because of failure to seek treatment for contagious illnesses.

Dr. Cohen relied on two studies which found that copayment programs "had a negative effect on utilization of health care services." Dr. Cohen said that according to the Congressional Office of Technical Assistance, "the HIE Study supported the conclusion that, contrary to the two primary goals of most prison Cost Sharing programs, Cost Sharing does not promote more cost-effective medical care decisions, nor does it discourage the use of unnecessary services." But without dispute (1) the copayment program does not deny access to health services and medication because of inability to pay and (2) the inmates will receive $15 at the beginning of each month to purchase personal items, an amount which the DOC may not seize to pay for health services and medication. Nonetheless, Dr. Cohen concluded that "the use of Cost Sharing will cause prisoners to suffer because they will not seek care, or because they will delay in seeking care for serious medical problems." As the District Court said in *Reynolds v. Wagner*, 936 *F.Supp.* 1216 (E.D.Pa.1996), even if a copayment policy discourages inmates from seeking medical care, "we still find no violation of the deliberate indifference standard [under the Eighth Amendment]." *Id.* at 1226. That court said:

> The fee program provides presumably adequate medical care at a nominal cost and ensures that no inmate goes without medical care for fiscal reasons. Just as Plaintiffs state that the program discourages the seeking of medical care, we can just as easily state in the alternative that the program forces inmates to make responsible decisions. If this results in inmates seeking medical care less frequently, it is by their own volition. We refuse to impute deliberate indifference to the prison merely because some inmates might make irresponsible choices.

> [*Id.* at 1226–27].

New Jersey's copayment statute does not deny medical services because of inability to pay and has built-in safeguards which include limiting the amount of funds which the DOC may deduct from an inmates' account to cover the cost of medical services.

In *Right to Choose v. Byrne*, 91 *N.J.* 287, 304, 450 *A.*2d 925 (1982), the Supreme Court of New Jersey stated: "Although we decline to proceed as far as the Chancery Division in declaring that the New Jersey Constitution guarantees a fundamental right to health ..., we recognize that New Jersey accords a high priority to the preservation of health." To ensure such rights to inmates, prison officials have an absolute duty to provide medical care during a term of imprisonment. *Saint Barnabas Medical Center v. Essex County*, 111 *N.J.* 67, 74, 543 *A.*2d 34 (1988). While provision of medical care by prison officials to prisoners is an uncompromisable duty, "it is up to the Legislature to determine who should bear the cost where there is no primary insurer or where the person treated cannot be served." *Cooper Medical Ctr. v. Johnson*, 204 *N.J.Super.* 79, 84–85, 497 *A.*2d 909 (Law Div. 1985), *aff'd*, 208 *N.J.Super.* 38, 504 *A.*2d 1199 (App.Div.1986) (medical center sought payment from township for services rendered to detainee and township sought indemnification from its insurance carrier).

The United States Supreme Court has recognized that payment of medical services for inmates is a matter of state law. In *Revere v. Massachusetts General Hospital*, 463 *U.S.* 239, 103 *S.Ct.* 2979, 77 *L.Ed.*2d 605 (1983), the Court held that the municipality was not responsible for the cost of medical care provided to detainee Kivlin because of injuries inflicted by the municipality's police officers. The police officers transported Kivlin to the emergency room of a local hospital. The hospital brought an action against the municipality for the cost of medical care rendered to Kivlin. The United States Supreme Court held that

> Revere fulfilled its constitutional obligation by seeing that Kivlin was taken promptly to a hospital that provided the treatment necessary for his injury. And as long as the governmental entity ensures that the medical care needed is in fact provided, the Constitution does not dictate how the cost of that care should be allocated as between the entity and the provider of the care. That is a matter of state law.

> [*Id.* at 245, 103 *S.Ct.* at 2983, 77 *L.Ed.*2d at 611].

Our legislature has established the public policy that inmates will share in the cost of their medical expenses by imposing on

them an obligation to pay a relatively "nominal fee" for certain medical costs. *N.J.S.A.* 30:7E–2(a). We cannot fairly say on this record that this policy is irrational or dangerous to the public or the inmate population. This copayment statute facially passes state and federal constitutional muster.

In *Johnson v. Department of Public Safety and Correctional Services,* 885 *F.Supp.* 817 (D.Md.1995), the district court granted the state's summary judgment motion in a case where plaintiff challenged Maryland's inmate medical copayment policy. In *Johnson,* plaintiff claimed violations of the Eighth Amendment, Equal Protection and Due Process clauses of the federal constitution. The Maryland copay policy charged "two dollars ($2.00) for certain non-emergency medical services available at the prison facility." *Id.* at 818. The court found that the stated purpose of the policy was "to reduce abuse of the sick call system." *Ibid.*

The *Johnson* court granted summary judgment for the state, finding that as a matter of law plaintiff's constitutional rights were not violated by the implementation of the copay system. Regarding plaintiff's federal Eighth Amendment claim, the judge found that the state policy explicitly established that inmates would not be denied medical services because of inability to pay. *Id.* at 819. The judge found that

> No reasonable jury—and certainly no jury familiar with the costs of the health care system with which the non-inmate population of this county must cope—could find that Defendant's co-pay policy represents a cruel and unusual punishment in violation of the Eighth Amendment. On the contrary, the flexible policy represents a commendable effort to promote inmate responsibility and the efficient use of scarce medical resources. Even if this Court believed otherwise, however the Supreme Court has made it clear that the inferior federal courts are not to second-guess the wisdom of prison regulations that do not violate constitutional norms.
>
> [*Id.* at 820 (citations omitted) ].

In *Johnson,* plaintiff's equal protection claim was based on discrimination in the provision of health care services on the basis of wealth or physical condition. The court observed that poor persons are not members of a "suspect class" and no fundamental right is implicated and thus, "the allegedly discriminatory policy must bear only 'a rational relationship to legitimate state pur-

poses.'" *Id.* at 821. The court found that a reasonable fact-finder could not say that the copay statute was rationally unrelated to a legitimate state interest.

Recognizing plaintiff's property right in his inmate account, the *Johnson* court also observed that minimal due process requirements must be met before the institution can deduct medical expenses from an inmate's account. The court found that prior notification of the policy and plaintiff's signing of an acknowledgment form provided sufficient due process. The court said that even if the plaintiff failed to sign the acknowledgment form, "the prisoner can hardly argue that his own refusal to sign the form acknowledging receipt of medical benefits he has received amounts to a due process violation." *Id.*

The judge in the case before us ruled on these constitutional challenges: alleged violations of (1) the Eighth Amendment, (2) the Due Process Clause, (3) the *ex post facto* prohibition and (4) the ACLU's state constitutional due process and equal protection claims. The ACLU urged that the copayment statute places an undue burden on plaintiff's interest in preservation of health, claiming that "the State has to demonstrate that its action is necessary to protect some important or compelling State interest." In his oral opinion, Judge Carchman observed that "[a]ny threat to plaintiffs' health is of great concern to this Court. Obviously, harm to one's health can be irreparable, and the State must never demonstrate deliberate indifference to plaintiffs' serious health problems, nor otherwise fail to respect the plaintiffs' significant health interests under the New Jersey Constitution."

As plaintiff forthrightly admits, the Supreme Court of New Jersey has not declared that the New Jersey Constitution guarantees a fundamental right to health. *Right to Choose*, 91 *N.J.* at 304, 450 *A.2d* 925. The *Right to Choose* Court said that where neither a fundamental right nor a suspect class is involved under the equal protection analysis "the legislative classification need only be rationally related to a legitimate state interest." *Id.* at 305, 450 *A.2d* 925.

We conclude that the State has a legitimate interest in defraying the cost of health care provided to inmates incarcerated in state and county facilities and in reducing the alleged abuse of the sick-call policy. While other means might possibly exist to reach those ends, rational basis analysis does not require the least restrictive means; it mandates only a rational relationship between the means and the end. In the present case the copayment statute is rationally related to these legitimate state interests—defraying cost and reducing over utilization and malingering.

■ Inmates have brought actions in various courts challenging similar copayment statutes enacted by our sister · or brethren states. These cases evince a trend towards upholding such statutes as not violative of the federal constitution, either facially or potentially. The Eighth Amendment to the United States Constitution provides that "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishment inflicted." *U.S. Const.* amend. VIII. As Judge Carchman observed, under the Eighth Amendment "the state must never demonstrate deliberate indifference to plaintiffs' serious health problems...."

> In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. It is only such indifference that can offend "evolving standards of decency" in violation of the Eighth Amendment.
>
> [*Estelle v. Gamble,* 429 *U.S.* 97, 106, 97 *S.Ct.* 285, 290–91, 50 *L.Ed.*2d 251, 261 (1976).]

*See Wilson v. Seiter,* 501 *U.S.* 294, 303, 111 *S.Ct.* 2321, 2326, 115 *L.Ed.*2d 271, 282 (1991) (applying the *Estelle* deliberate indifference standard).

"Although the government must provide medical care, the Supreme Court has never held the government must pay for it." *Reynolds,* 936 *F.Supp.* at 1223 (citing *City of Revere v. Massachusetts General Hospital,* 463 *U.S.* 239, 245, n. 7, 103 *S.Ct.* 2979, 2984, n. 7, 77 *L.Ed.*2d 605 (1983)).

Judge Carchman correctly found that,

> Both the co-payment law and the policy circular plainly state that the medical services may not be withheld based upon an inmates' inabilit[y] to pay. The

Legislature and DOC are obviously aware of a constitutional minimum standard of health care applicable in the prisons.

Other limitations on the co-payment statute's capacity to interfere with inmate health are provided by the limitation of withdrawals from inmates' trust accounts. As previously noted, deductions are limited by statute and regulation to one third of an inmates' income, and funds over and beyond the minimal balance of $15. Proper implementation of these provisions will ensure that inmates' labors will never be exhausted exclusively on health care, and inmates will have at least $15 per month to spend on personal amenities, assuming they earn that much. Simply put, inmates will not face the Hobson's choice suggested by Amicus.

On the eve of oral argument, Amicus submitted numerous inmate certifications that raised serious concerns with this Court. It was unclear whether inmates understood the implementation of the new law, as well as how the policy would work in case of chronic illness and regular medication. Subsequent to oral argument, the State submitted its own certifications regarding efforts made to clarify policy both to prison administrators and to inmates as well. The State emphasized that the policy does not charge inmates for follow-up medical visits, that prescriptions will be written in as large a quantity as would be acceptable if this were a medical practice outside of the prison. Thus, inmates will not be charged numerous co-payments to complete treatment of illness, nor will they be subject to unlimited charges for longer term illnesses.

As the judge properly concluded, the State has met its duty under the Eighth Amendment of providing inmates with access to medical care.

"Nothing in the Eighth Amendment, which prohibits certain punishment, requires a state to provide an inmate free of charge, with a necessary commodity that would not be free outside the prison walls and which the inmate has the legal means to obtain." *Martin v. DeBruyn,* 880 *F.Supp.* 610, 614 (N.D.Ind.1995).

Judge Carchman's ruling is entirely consistent with rulings of other courts which have considered copayment statutes in the context of the Eighth Amendment. See *Shapley v. Nevada Bd. of State Prison Comm'rs,* 766 *F.*2d 404, 408 (9th Cir.1985) ($3 fee for medical visits did not represent a deliberate indifference); *Boblett v. Angelone,* 942 *F.Supp.* 251, 254 (W.D.Va.1996); *Reynolds v. Wagner,* 936 *F.Supp.* 1216 (E.D.Pa.1996); *Turcios v. Dep't of Corrections,* 1996 WL 193849 (N.D. Cal.1996 (not reported in *F.Supp.*)); *Hudgins v. DeBruyn,* 922 *F.Supp.* 144 (S.D.Ind.1996); *Johnson v. Dept. of Public Safety & Corr. Services,* 885 *F.Supp.* 817 (D.Md.1995); *Martin v. DeBruyn,* 880 *F.Supp.* 610, 615

(N.D.Ind.1995); *Benter v. Peck*, 825 *F.Supp.* 1411 (S.D.Iowa 1993). Although the *Benter* court found a violation of the Eighth Amendment, it did not find that the Indiana state prison's policy violated the constitution but that the particular circumstances displayed "deliberate indifference to Benter's serious medical needs." *Id.* at 1422, 1418 n. 4. *Cf. Collins v. Romer*, 962 *F.*2d 1508, 1514 (10th Cir.1992) (Tenth Circuit affirmed the district court's finding that a copayment requirement containing no exceptions was unconstitutional). While not perfect or perhaps even optimal, we conclude that the New Jersey copayment statute does not violate the Eighth Amendment of the federal constitution or the State constitution.

## VI.

■ The United States and New Jersey constitutions prohibit the government from enacting a law which increases punishment for a crime, greater than when it was committed. *Calder v. Bull*, 3 *Dall.* 386, 3 *U.S.* 386, 390, 1 *L.Ed.* 648 (1798); *In re Kaplan*, 178 *N.J.Super.* 487, 429 *A.*2d 590 (App.Div.1981). The issue in an *ex post facto* analysis is "whether the legislative aim was to punish that individual for past activity, or whether the restriction of the individual comes about as a relevant incident to a regulation of a present situation[.]" *DeVeau v. Braisted*, 363 *U.S.* 144, 160, 80 *S.Ct.* 1146, 1155, 4 *L.Ed.*2d 1109, 1120 (1960).

The Supreme Court of New Jersey in *Doe v. Poritz*, 142 *N.J.* 1, 662 *A.*2d 367 (1995), said that,

> Our review of the law leads to the following conclusions: a statute that can fairly be characterized as remedial, both in its purpose and implementing provisions, does not constitute punishment even though its remedial provisions have some inevitable deterrent impact, and even though it may indirectly and adversely affect, potentially severely, some of those subject to its provisions. Such a law does not become punitive simply because its impact, in part, may be punitive unless the only explanation for that impact is a punitive purpose: an intent to punish.
>
> *[Id.* at 43, 662 *A.*2d 367].

Judge Carchman found no "hint that the statute or the manner of its implementation are punitive in nature. They are clearly

remedial and do not constitute *ex post facto* punishment." As the State contends on appeal, "[t]his is no more 'punitive' than the copayments that millions of non-incarcerated citizens throughout the nation are called upon to pay under the terms of their health plans." While not pain-free, we find the copay provision is not constitutionally punitive.

Finally, an inmate has a property right in an inmate trust account; "plaintiffs are correct that they are entitled to due process as to deductions made from their accounts." *Artway v. Scheidemantel,* 671 *F.Supp.* 330, 336–37 (D.N.J.1987). "The minimum requirements of due process, therefore, are notice and the opportunity to be heard." *Doe v. Poritz,* 142 *N.J.* 1, 106, 662 *A.*2d 367 (1995).

As Judge Carchman pointed out, inmates have an opportunity institutionally to grieve the issues raised by the acknowledgment form (HS–01),[3] and thus, "plaintiffs' due process rights are protected." *See N.J.A.C.* 10A:1–3.1–3.8 (ADA grievance procedure); *see also Johnson,* 885 *F.Supp.* at 821 (finding "the 'process due,' if any, is truly minimal"). The *Johnson* court found that the notification and acknowledgement procedures of the copayment program were sufficient to withstand a due process challenge. *Id.* at 821–22. We agree.

Affirmed.

---

[3] *Procedures for request of health care services.*

Health care service requests are made through established institutional procedures. Each institution shall maintain and make available to inmates all procedures and pertinent information regarding access to health care.
a. The inmate requesting health care services must complete a medical request form HS–01. HS–01 informs the inmate that there may be a charge for services and that any charge assessed may be grieved.