

1997 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

10-22-1997

# Reynolds v. Wagner

Precedential or Non-Precedential:

Docket
96-1810

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1997

Recommended Citation

"Reynolds v. Wagner" (1997). *1997 Decisions*. Paper 249.
http://digitalcommons.law.villanova.edu/thirdcircuit_1997/249

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1997 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed October 22, 1997

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 96-1810

RICHARD REYNOLDS; DAVID BORRELL; ROLANDO
FELIX; JULIO ARACHO; ROBERT SANTILLO; KURT
MIHALSKI; LUIS SANTIAGO-ALVARADO; JESUS DELEON,
AND THESE SIMILARLY SITUATED INDIVIDUALS,
    Appellants

v.

GEORGE WAGNER, WARDEN, DIRECTOR OF PENNA.
INSTITUTIONAL HEALTH SERVICES INC.; CARL
HOFFMAN, JR., SUPERVISOR OF PENNA. INSTITUTIONAL
HEALTH SERVICES; CAROL COLBURN

      WASHINGTON LEGAL
      Amicus-Appellee

ON APPEAL FROM THE
UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
(D.C. Civil No. 94-06663)

Argued: April 18, 1997

Before: GREENBERG, ALITO, and ROSENN,
Circuit Judges

(Opinion Filed: October 22, 1997)


      JULES EPSTEIN (Argued)
      Kairys, Rudovsky, Kalman,
       Epstein & Messing
      924 Cherry Street - 5th Floor
      Philadelphia, PA 19107

      Angus R. Love
      Pennsylvania Institutional Law
       Project
      924 Cherry St., Suite #523
      Philadelphia, PA 19107

      Counsel for Appellants

      DONALD E. WIEAND, JR. (Argued)

Stevens & Lee
P.O. Box 20830
Lehigh Valley, PA 18002

Counsel for Appellee

Daniel J. Popeo
Paul D. Kamenar
Washington Legal Foundation
2009 Massachusetts Avenue, N.W.
Washington, D.C. 20036

 Amicus-Appellee

OPINION OF THE COURT

ALITO, Circuit Judge:

Several years ago, the Berks County Prison instituted a "fee-for-service" policy under which it began charging inmates a small fee when they sought health care. Under this policy, indigent inmates are guaranteed care, but their prison accounts are debited for the relevant charges. In this appeal, we consider constitutional challenges to this policy.

I.

A. The following facts are uncontested or were found by the district court. See Reynolds v. Wagner, 936 F. Supp.

2

1216, 1219-23 (E.D. Pa. 1996). The Berks County Prison houses both pre-trial detainees and sentenced prisoners. Of the institution's average daily population of approximately 775, between 100 and 120 are federal inmates housed under contract with the federal government. The remaining 550 inmates are held under state law. Approximately 35% of the inmate population is Hispanic, and approximately 10% of the population speaks only Spanish.

The Berks County Prison styles itself as a "new generation prison" based on the philosophy of providing inmates with more choices in their daily lives so that they can learn to act more responsibly. In accordance with this approach, the prison, in 1993, adopted a program under which the inmates held under state law are generally charged small fees when they seek health care. The purpose of the fee program is not to generate revenue but to "instill inmate responsibility and discourage abuse of sick call." Reynolds, 936 F. Supp. at 1219.

Under the program, inmates are charged a $3 fee for a medical evaluation by a nurse. (This is referred to as "sick call.") If a nurse refers an inmate to the doctor after the initial sick call, there is no charge to see the doctor. However, if the inmate chooses to see the doctor without a referral, there is a $5 charge. If the doctor decides that the inmate should have been referred at the initial screening, the $5 charge is waived. Inmates are not charged for follow-up visits ordered by a doctor or nurse and are not charged for legitimate return visits for a condition for which they have already been treated. Inmates are not charged for prescription medicine, and over-the-counter medication is issued by the medical department if deemed necessary for an inmate's treatment. Over-the-counter medication is also available for purchase from the commissary.

The Inmate Handbook sets forth certain exceptions to the fee requirement. Initial commitment screenings, psychiatric services, and emergency services1 are free. Similarly, there

_____

1. Some accidents qualify as emergencies, but some do not. For example, the Inmate Handbook explains that while a cut requiring stitches is an emergency and does not require a fee, a twisted ankle from activities in the recreation yard is not an emergency. In addition, treatment required as a result of activity in violation of prison policy results in a fee.

is no fee for the treatment of chronic illnesses, including such treatment as changes of dressings, colostomy changes, and treatment for conditions such as diabetes, hypertension, or AIDS related syndrome. The determination of whether a condition at sick call is a chronic illness or emergency is made by a member of the nursing staff. The assessment of an inmate's condition is made independently and regardless of his financial status.

Whenever medical service is provided, an inmate is required to sign a "Medical Service Fee Form." Id. at 1220. If the inmate refuses to sign the form, a member of the medical staff initials the form, and the fee is deducted from the inmate's account. No inmate is ever refused treatment because he lacks funds in his account, but the account of an inmate who lacks funds is nevertheless debited, and a negative balance is thus created.

If an inmate's account has a negative balance, 50% of his incoming funds are used to satisfy the negative account, and the the remainder can be used for personal purchases. This 50% deduction continues until the negative balance is eliminated. At discharge, any available funds are credited

towards the inmate's negative balance and the remainder, if any, is paid to the inmate. Negative balances that remain on an inmate's account after discharge are maintained on the inmate's permanent record. If the inmate is recommitted, the negative balance is imposed again. In addition, if an inmate departs the prison with a negative balance, a collection agency may be employed to collect the debt.

The nurse who makes the initial assessment of an inmate's condition informs the prisoner about the channels through which a fee assessment can be challenged. An inmate who disagrees with a fee assessment mustfirst file an "inmate communication form," which is reviewed by the medical department. Id. at 1221. An inmate who receives an unfavorable response to his inmate communication may submit a grievance to a prison committee2  consisting of the

_____

2. The Inmate Handbook states that "a grievance may not be filed simply because you disagree with a staff member's decision or instructions,

4

warden, the assistant warden, the deputy warden for treatment services, the deputy warden for custody services, and the director of administrative services. Grievances are decided by a majority vote of the committee whose decisions may be appealed to the Berks County Prison Board.

Details on the workings of the program are contained in the Inmate Handbook. Copies of the Inmate Handbook are provided in each housing unit, in the library, and in every department of the prison. During orientation, a prison officer and a counselor review the contents of the Inmate Handbook with the inmates and answer questions. Although there is no copy of the Inmate Handbook in Spanish, Spanish-speaking officers and counselors explain the Handbook to all Spanish-speaking inmates during orientation. Moreover, the medical department employs "at least three nurses" who are fluent in Spanish. Id. at 1222.

B. In November 1994, individual inmates filed this action under 42 U.S.C. S 1983, challenging the constitutionality of the program. The original complaint was subsequently amended, and the case was certified as a class action in February 1995. Named as defendants were the Berks County Prison and its warden.3

In August 1995, the district court issued an order bifurcating trial on the issues of liability and damages. In

_____

unless it meets the above criteria." Id. at 1221. Included in the "above criteria" are grievances that concern alleged violations of jail policy. The warden of the Berks County Prison testified that grievances about fee assessments fall into the category of complaints about violations of jail policy and are thus proper. The district court credited the warden's testimony that medical fee charges could be challenged by means of grievances even though the wardens' testimony arguably conflicted with the testimony of a deputy warden. There was also the testimony of two inmates that they were aware that medical fee assessments could be contested in this way.

3. The district court certified a class "consisting of all indigent persons who have been, are, or will be subjected to the challenged medical services fee policy." Reynolds v. Wagner, 936 F. Supp. 1216, 1218 (E.D. Pa. 1996).

May 1996, the court held a one-day trial on the issue of liability. At the conclusion of the trial, the district court rejected the inmates' constitutional claims. See Reynolds v. Wagner, supra. This appeal followed.

C. On appeal, the inmates challenge three of the district court's holdings: (i) that the fee-for-service policy did not constitute deliberate indifference to the inmates' serious medical needs and therefore did not violate their Eighth Amendment or Fourteenth Amendment rights; (ii) that the fee-for-service program did not result in the taking of inmate property without due process; and (iii) that the program did not impermissibly infringe on the inmates' First Amendment right of access to the courts.

The Supreme Court has rejected strict scrutiny as the appropriate standard of review for the constitutionality of prison regulations. Turner v. Safley, 482 U.S. 78 (1987); see also Monmouth County Corr. Inst. Inmates v. Lanzaro , 834 F.2d 326, 332 (3d Cir. 1987). Instead, the question is whether the regulation is reasonably related to a legitimate penological interest. Lanzaro, 834 F.2d at 332. In determining the reasonableness of a challenged regulation, we consider:

>        (1) the rational relationship between the regulation
>        and the governmental interest put forward to justify it;
>
>        (2) the existence of alternative means to exercise the
>        asserted right;

(3) the impact on prison resources of accommodating the asserted right; and

(4) the existence of "ready alternatives" to accommodate the asserted right at "de minimis" cost to valid penological interests.

Id. (citation and footnote omitted).

The inmates' central claim concerns the validity of regulations relating to the prison's provision of health care. The specific standard applicable to an Eighth Amendment claim concerning the denial of health care to inmates is the two-pronged standard enunciated in Estelle v. Gamble, 429 U.S. 97, 104 (1976). This standard requires a showing (1)

that the prison officials were deliberately indifferent to the inmates' medical needs and (2) that those needs were serious. Id. We apply the Estelle standard in the context of the level of scrutiny set out by Turner.

II.

DELIBERATE INDIFFERENCE

A. The inmates make two separate sets of arguments as to why the Berks County Prison program constitutes "deliberate indifference" to their "serious medical needs." First, they contend that charging inmates for health care is per se unconstitutional because the Constitution bars a state from conditioning inmates' access to health care on their "ability or willingness to pay." (Appellants' Br. at 13). Second, the inmates maintain that even if a fee-for-service program is not per se unconstitutional, the Berks County Prison program is unconstitutional "as implemented."

B. Before addressing the merits of these arguments, however, we must consider the defendants' contention that the inmates lack standing because they "have demonstrated no actual harm." (Appellees' Br. at 23). The defendants contend that the inmates "offered no evidence to support a finding that serious medical conditions were untreated or even that treatment was delayed because of the medical fee policy." Id.

In making this argument, the defendants rely on Lewis v. Casey, 116 S. Ct. 2174, 2179 (1996), in which the Supreme Court held that because a class of inmates had not shown widespread actual injury, the class could not challenge

certain features of a state correctional system that allegedly infringed upon the class's right of access to the courts. The Court explained:

> It is the role of courts to provide relief to claimants, in individual or class actions, who have suffered, or will imminently suffer, actual harm; it is not the role of courts, but that of the political branches, to shape the institutions of government in such fashion as to comply with the laws and the Constitution . . . .

7

> [T]he distinction between the two roles would be obliterated if, to invoke intervention of the courts, no actual or imminent harm were needed, but merely the status of being subject to a governmental institution that was not organized or managed properly.

116 S. Ct. at 2179. Then, in an example on which the defendants in this case rely, the Court stated:

> If . . . a healthy inmate who had suffered no deprivation of medical treatment were able to claim violation of his constitutional right to medical care, see Estelle v. Gamble, 429 U.S. 97, 103, 50 L. Ed 2d 251, 97 S. Ct. 285 (1976), simply on the ground that the prison medical facilities were inadequate, the essential distinction between judge and executive would have disappeared: it would have become a function of the courts to assure adequate medical care in prison.

Id.

The inmates counter that this statement in Lewis is dictum and that the Court's prior holding in Helling v. McKinney, 509 U.S. 25 (1993), controls. In Helling, an inmate brought a S 1983 action against prison officials, alleging violations of his Eighth Amendment Rights due to exposure to environmental tobacco smoke. Id. The inmates argue that the Helling Court specifically held that an Eighth Amendment claim may be based on prison conditions that pose an unreasonable risk to a prisoner's future health. Id. at 33-34. Helling explained:

> We have great difficulty agreeing that prison authorities may not be deliberately indifferent to an inmate's current health problems but may ignore a condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year.

Id. at 33.

While we do not view the statement in Lewis as necessarily inconsistent with Helling, we need not attempt to reconcile these precedents because the inmates' claims clearly fail on the merits. See Norton v. Mathews, 427 U.S. 524, 530-31 (1976) (where merits can be resolved in favor

of party challenging jurisdiction, resolution of complex jurisdictional issue may be avoided).

C. The "Per Se" Challenge.  The inmates assert that the prison, in charging them a modest fee for health care, is violating the Eighth Amendment's bar on "cruel and unusual punishment." The Eighth Amendment applies to sentenced prisoners, but the Due Process Clause of the Fourteenth Amendment operates to provide similar protection for pre-trial detainees. See Boring v. Kozakiewicz, 833 F.2d 468, 472 (3d Cir. 1987) ("[T]he Due Process rights of a pre-trial detainee are at least as great as the Eighth Amendment protections available to a convicted prisoner.") (quotation omitted); Johnson v. Glick, 481 F.2d 1028, 1032 (2d Cir. 1973) ("[I]t would be absurd to hold that a pre-trial detainee has less constitutional protection against acts of prison guards than one who has been convicted.").

The Supreme Court has held that the Eighth Amendment's prohibition against cruel and unusual punishment requires the provision of basic medical care. See Helling, 509 U.S. at 32; Estelle v. Gamble, 429 U.S. 97, 103-04 (1976). There is, of course, no general constitutional right to free health care. In prisons, however, since inmates are deprived of the ability to seek health care on their own, the state is obligated to provide basic health care. As the Supreme Court explained in DeShaney v. Winnebago County Dept. of Social Services, 489 U.S. 189 (1989):

> [W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well being. . . . The rationale for this is simple enough: when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs -- e.g., food, clothing, shelter, medical care, and reasonable safety -- it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause.

Id. at 199-200.

In order to establish an Eighth Amendment (and Fourteenth Amendment) violation a plaintiff must demonstrate that there was a " `deliberate indifference [on the part of the State] to serious medical needs of prisoners.' " Helling, 509 U.S. at 32 (quoting Estelle, 429 U.S. at 104). Such conduct would constitute an "unnecessary and wanton infliction of pain contrary to contemporary standards of decency." Helling, 509 U.S. at 32; see also Estelle, 429 U.S. at 104.

Although the Supreme Court has held that a state must provide inmates with basic medical care, the Court has not tackled the question whether that care must be provided free of charge. Cf. City of Revere v. Massachusetts Gen. Hosp., 463 U.S. 239, 245 n.7 (1983) ("Nothing we say here affects any right a hospital or government entity may have to recover from a detainee the cost of medical services provided to him."). The district court here held that there is nothing unconstitutional about a program that "require[s] that inmates with adequate resources pay a small portion of their medical care." Reynolds, 936 F. Supp. at 1224. We agree. We reject the plaintiffs' argument that charging inmates for medical care is per se unconstitutional. If a prisoner is able to pay for medical care, requiring such payment is not "deliberate indifference to serious medical needs." Helling, 509 U.S. at 32. Instead, such a requirement simply represents an insistence that the prisoner bear a personal expense that he or she can meet and would be required to meet in the outside world. See, e.g., Shapley v. Nevada Bd. of State Prison Commissioners, 766 F.2d 404, 408 (9th Cir. 1985) (nothing per se unconstitutional about charging an inmate $3 for every medical visit; such a charge, by itself, did not constitute deliberate indifference under Estelle); Mourning v. Correctional Medical, 300 N.J. Super. 213, 226 (1997); Words v. Graves, 1997 WL 298458, *3 (D. Kan. May 28, 1997); Gardner v. Wilson, 959 F. Supp. 1224, 1228 (C.D. Cal. 1997); Hutchinson v. Belt, 957 F. Supp. 97, 100 (W. D. La. 1996); Robinson v. Fauver, 932 F. Supp. 639 (D.N.J. 1996); Bihms v. Klevenhagen, 928 F. Supp. 717, 718 (S.D. Tex. 1996); Hudgins v. Debruyn, 922 F. Supp. 144 (S.D. Ind. 1996); Johnson v. Dep't of Pub. Safety & Corr. Serv., 885 F. Supp. 817, 820 (D. Md. 1995).

Contrary to the inmates' suggestion, we see nothing in our prior decision in Monmouth County Corr. Institution Inmates v. Lanzaro, supra, that casts doubt on the constitutionality of the program challenged here. In Lanzaro, our court wrote that prison officials may not "condition provision of needed medical services on [an] inmate's ability or willingness to pay." 834 F.2d at 347. The program at issue does not "condition the provision of needed medical services on an inmate's ability to pay." Under the program, no inmate is ever denied medical care for lack of money. Nor does the program condition the provision of medical care on an inmate's "willingness" to pay in the sense that we understand the Lanzaro court to have used that term. In making the statement in question, Lanzaro cited Ancata v. Prison Health Services, Inc., 769 F.2d 700, 704 (11th Cir. 1985). There, the prison officials knew that the inmate (Ancata) was seriously ill and needed to see a specialist, but despite Ancata's complaints, the prison officials refused to send him to one unless he agreed to bear the costs of the evaluation. Id. at 702. Ancata could not fulfill their condition because he was indigent. Id. As it turned out, Ancata had leukemia, and he died soon after from respiratory failure. Id. It is thus apparent that the statement in Lanzaro refers to the withholding of essential medical treatment from an inmate who refuses to agree to pay because of indigency. Nothing of this sort can happen under the Berks County Prison program at issue here.

The inmates' argument also finds no support in the statement in Lanzaro that a case of deliberate indifference is made out " `if necessary medical treatment is delayed for non-medical reasons.' " 834 F.2d at 346 (quoting Ancata, 769 F.2d at 704). Under the Berks County Prison program, the prison officials do not delay the provision of medical care to any inmate who seeks such care. The program instead simply assesses a modest fee under some circumstances. If any delay occurs, it is solely because of decisions made by the inmates themselves, not because of any conduct on the part of the prison administration.

The plaintiffs in this case ask us to stretch the bar on "cruel and unusual punishment" to a program that simply attempts to provide inmates with a modest disincentive to

abuse sick call. Although the Supreme Court stated in Trop v. Dulles, 356 U.S. 86, 101 (1958), that the Eighth Amendment "must draw its meaning from evolving standards of decency that mark the progress of a maturing society," plaintiffs have not demonstrated that a prison's fee-based program violates such standards. On the

contrary, fee-for-service programs are very common outside prisons.

Although it is possible that the fee-based program at issue here may cause some prisoners to refrain from seeking medical treatment as early as they might otherwise do so, the deliberate indifference standard of Estelle does not guarantee prisoners the right to be entirely free from the cost considerations that figure in the medical-care decisions made by most non-prisoners in our society. The Supreme Court explained in Turner v. Safley, 482 U.S. 78 (1987):

> [W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests. In our view, such a standard is necessary if prison administrators, and not the courts, are to make the difficult judgments concerning institutional operations.

Id. at 89 (quotations and citations omitted); see also Lewis, 116 S. Ct. at 2185. Here, the fee-for-service plan was adopted to teach prisoners financial responsibility and to deter the abuse of sick call. Both of these goals fall well within the ambit of "legitimate penological interests." See James v. Quinlan, 866 F.2d 627, 630 (3d Cir. 1989) ("Here the Inmate Financial Responsibility Program would appear to be reasonably related to a legitimate penological interest in encouraging inmates to rehabilitate themselves by developing a sense of financial responsibility.").

D. The "As Implemented" Challenge. The inmates next argue that even if it is not per se unconstitutional to charge prisoners for medical care, the Berks County program is unconstitutional as implemented because it creates a substantial barrier to health care, i.e., one that meets the deliberate indifference standard of Estelle. The inmates point to eight separate features of the Berks County program as problematic:

12

> [1.] the burden of a fee system on a poor, non-mobile population, which has been scientifically demonstrated to have negative and potentially dangerous health consequences, particularly by causing poor persons to defer medical care until medical conditions grow especially serious;

> [2.] the imposition of fees higher than thos e assessed in the statewide Medicaid program for indigent persons, thereby imposing a substantial barrier to

health care;

[3.] the failure to provide a written Spanis h-language version of the fee-for-service policy;

[4.] the failure to properly define the te rms "chronic illness" and "emergency," which causes inmates to forego medical attention because they cannot determine what services are covered;

[5.] the failure to properly define the te rms "chronic illness" and "emergency," which causes inmates to be arbitrarily deprived of health care because of the lack of uniform standards;

[6.] the failure to offer free medical treat ment for emergencies (even life-threatening ones) when the injury came about as a result of an inmate violating prison rules and regulations, which deprives inmates of medical care in the most serious of conditions and causes inmates to forego seeking such attention;

[7.] the exclusion of "contagious diseases" from the categories of fee-exempt medical services; and

[8.] the creation of "negative balances" for inmate accounts and announcing the intention of seeking to collect such debts after an inmate is discharged from prison, which actively discourages inmates from seeking medical attention in circumstances where the inmates suffer serious medical conditions.

(Appellants' Br. at 13-14).

As with their "per se" challenge, the district court found the inmates' "as implemented" challenge wanting, and rejected it. Reynolds, 936 F. Supp. at 1226. We agree.

13

For convenience, we will consolidate the inmates' eight complaints into four: (i) that the fee-for-service program charges higher fees than the statewide Medicaid program (complaint # 2); (ii) that the program's terms are not adequately communicated to the inmates, and that this causes the inmates to forego care because they do not understand when a fee will be assessed (complaints ## 3, 4 & 5); (iii) that program causes inmates unduly to delay in seeking necessary medical care (complaints ## 1, 6 & 8); and (iv) that charging fees for the treatment of contagious diseases causes an unneeded increase in the risk that such illnesses will spread in the inmate population (complaint

# 7).

(i) Higher Fees than Medicaid.  The inmates present us with no more than a general assertion that the fee-for-service program charges "higher" fees than the statewide Medicaid program. (Appellants' Br. at 20). They point to no evidence regarding the magnitude of the difference. 4 More fundamentally, we see no basis for concluding that the fees charged under Medicaid represent the maximum that may constitutionally be charged against a prisoner's account. See Reynolds, 936 F. Supp. at 1225. We therefore reject the inmates' argument.

(ii) Inadequate Communication.  The inmates' complaint # 3 is that the prison authorities have failed "to provide a written Spanish-language version of the . . . policy." (Appellants' Br. at 14). The district court rejected the claim that this deprived Spanish-speaking inmates of access to care. The court explained that, although there was no written Spanish version of the policy,

> Spanish speaking correctional officers and counselors . . . explain the Handbook, which contains a thorough

---

4. In addition, in the fact section of their brief, the inmates state that "Pennsylvania's Medicaid fee schedule sets fees for doctors' and nurses' visits at amounts substantially lower than those set by Berks County Prison. Pa. Code S 1101.63(b)." (Appellants' Br. at 7). Once again, however, this assertion is too vague and conclusory to support the inmates' claim. Cf. Commonwealth of Pa. v. HHS, 101 F.3d 939, 945 (3d Cir. 1996) (arguments mentioned in passing, but not squarely argued, are deemed waived).

14

> description of the medical fee program, to all Spanish speaking inmates during orientation. Finding of Fact 30. In addition, there is always a Spanish speaking employee on duty, twenty-four hours a day and the medical department employs at least three nurses who are fluent in Spanish. Finding of Fact 30.

Reynolds, 936 F. Supp. at 1225. In light of these facts, we agree with the district court that the lack of a Spanish translation of the policy does not constitute deliberate indifference. However, we also join the district court in urging the prison authorities to provide such a translation.5

In complaints ## 4 and 5, the inmates assert that the failure of the prison to define the terms "chronic illness" and "emergency," causes inmates to "forego medical

attention" and to be "arbitrarily deprived of health care."
(Appellants' Br. at 14). (As previously noted, no fee is
assessed when treatment is sought for "chronic illness" or
in case of "emergency"). Although the Inmate Handbook
does not provide a definition of either term, it lists examples
of chronic illnesses (dressing changes, colostomy changes,
and treatment for conditions such as diabetes,
hypertension, or AIDS related syndrome) and emergencies
(a cut requiring stitches). Reynolds, 936 F. Supp. at 1225.
In addition, the handbook provides examples of non-
emergencies (a twisted ankle from activities in the
recreation yard and treatment required as a result of
activity in violation of prison policy). Id.

We agree with the district court that "[t]hese explanations
of the above exempted services do not cause the fee
program to run afoul of the deliberate indifference
standard." Id. at 1226. The terms "chronic illness" and
"emergency" are not obscure. Moreover, the district court

_____

5. As noted, the Berks County Prison has a population that is
approximately 35% Hispanic, and 10% of the total population speaks no
English. Reynolds, 936 F. Supp. at 1219. The district court thus wrote:

        [W]e . . . encourage Prison Officials to make available a copy of
the
        Inmate Handbook in the Spanish translation. This should mitigate
        any lingering difficulties stemming from the language barrier.

Id. at 1225. We endorse this suggestion.

15

found as a fact that "[i]nmates know or should know that
they will never be denied medical care because of an
inability to pay." In other words, the inmates know that
they will never be denied care even if they do not have
enough money and the condition for which treatment is
sought does not fit into one of the fee-exempt categories.

(iii) Delays in Seeking Treatment.  Complaints ## 1, 6,
and 8 boil down to a single assertion: that the fee-for
service program causes inmates to delay unduly in seeking
care. The theoretical argument is that the charges that the
program imposes ($3 for a visit to the nurse and $5 for a
visit to the doctor) lead near-indigent prisoners to delay and
even forego care for serious medical conditions, rather than
using up their scarce funds. We reject this argument for
two reasons.

First, the inmates did not provide evidence supporting

this claim. There is almost no evidence that inmates have in fact delayed in seeking important treatment because of the fee-for-service program. Indeed, the inmates' expert, Dr. Robert L. Cohen, acknowledged that he had not seen any harm resulting to the inmates as a result of the program. (App. Vol. I, p. 87). Dr. Cohen did testify that he believed, based on studies of the effects of co-payment plans on non-prison, indigent and near-indigent populations, that the Berks County plan would deter inmates from seeking treatment when they optimally should. (App. Vol. I, pp. 25, 31 & 36; noting that there is almost no published data on the effects of co-payment plans on prison inmates). But Dr. Cohen's testimony was far too vague and removed from the context at hand for the district court to have found that the Berks County program in fact has the widespread effect of deterring inmates from seeking necessary health care.

Second, even if the modest fees assessed under the Berks County Prison program did deter some prisoners from seeking medical care at the optimal time, we do not believe that such a deterrent effect amounts to cruel and unusual punishment or that it violates the due process rights of pretrial detainees. Putting aside for the moment the inmates' asserted need for the money in their prison account to pay for certain litigation expenses, the inmates have not pointed out evidence showing that they need this

16

money for any vital expenses. Inmates generally use their prison funds to purchase items at the commissary, but the most important items that inmates might otherwise purchase at the commissary are provided free of charge to indigent inmates. These items include "toilet articles, soap, shampoo, toothpaste, [a] toothbrush[,] .. . writing paper, [postage paid] envelopes, pens, [and] pencils." (App. Vol. IV., p. 1031).

The testimony of several inmates was illustrative. Inmate Richard Reynolds, testified that he did not seek medical treatment because his account balance was low, he needed legal materials, and his hygienic needs cost him $20 per week. (App. Vol. II, p. 402). Yet he testified that he purchased a newspaper at $3.35 per week (id. at 417); he subscribed to Easy Rider magazine and Hot Rod magazine for $39.95 and $14.95 respectively (id. at 420); he made out money orders to various payees in the amounts of $100 or $200, as well as one to his father for a car payment (id. at 439); received $20 every two weeks from his father; and he made purchases of snacks and candy in the amounts of $30, $20, and $20 (id. at 441-42). Reynolds further testified that he delayed seeking medical treatment when he had a

cold and as a result his condition got worse (id. at 403). Ultimately, Reynolds was seen by the medical department 75 times and was charged a total of $14, a small amount in comparison to his other expenses. (Id. at 433).

It is apparent that the Berks County Prison Program does not force inmates to choose between necessary medical care and other essentials. Rather, it forces them to choose between, on the one hand, the payment of a small fee for certain types of non-emergency medical care and, on the other hand, the use of these funds for non-essential expenses. Putting inmates to this choice does not violate the Eighth or Fourteenth Amendments.

(iv) Fees for Treatment of Contagious Diseases.  In complaint # 7, the inmates argue that the exclusion of contagious diseases from the categories of fee-exempt medical services constitutes deliberate indifference to serious medical needs. Of their eight complaints, the inmates give this one the least attention. Their argument on this issue in their main brief consists of the single

17

statement: "Expert testimony established the clear danger of this exclusion [i.e., the contagious disease exclusion]." As a threshold matter, an argument consisting of no more than a conclusory assertion such as the one made here (without even a citation to the record) will be deemed waived. See Commonwealth of Pa. v. HHS, 101 F.3d 939, 945 (3d Cir. 1996) (arguments mentioned in passing, but not squarely argued, will be deemed waived); see also Southwestern Pa. Growth Alliance v. Browner, 121 F.3d 106, 122 (3d Cir. 1997) ("appellate courts generally should not address legal issues that the parties have not developed through proper briefing.").

In addition, not only is the inmates' theoretical argument made inadequately, but the argument suffers from a lack of supporting evidence. As best we can tell, the theoretical argument underlying the contagious disease claim has to do with externalities. The argument is that if inmates with contagious diseases delay seeking treatment, the result is that other inmates will be exposed to the risk of contagion for a greater amount of time than they would be otherwise, i.e., there is an external effect in addition to the internal effect. Cf. Richard J. Zeckhauser, Coverage for Catastrophic Illness, 21 Pub. Pol'y 149, 164, 159-70 (1973) (describing the positive externalities of health care attributable to a reduction of contagion).

Because of the modest nature of the fees and the absence

of evidence that inmates need the funds in their prison accounts for essential expenses, we do not think that an inmate could assert a valid Eighth or Fourteenth Amendment claim on the ground that the Berks County Prison program harmed him by causing him to delay seeking medical care for a contagious disease. Under the circumstances, any delay and resulting harm could be attributable to his own unjustified decision.

On the other hand, in such a case, the effect of a single inmate's choosing to delay treatment is suffered not only by that inmate, but also by everyone else -- they all suffer an increased risk of contracting the contagious disease. It is conceivable that an inmate might be able to assert a valid Eighth or Fourteenth Amendment claim if he could show that a prison fee program caused other inmates to delay

seeking treatment to such an extent as to cause a serious risk of an epidemic, that prison officials knew of this serious risk, but that they exhibited deliberate indifference to it and thus failed to take proper precautions. Cf. Hutto v. Finney, 437 U.S. 678, 682 (1978) (noting that among the prison conditions for which the Eighth Amendment required a remedy was placement of inmates in punitive isolation under conditions where infectious diseases could spread easily); Gates v. Collier, 501 F.2d 1291 (5th Cir. 1974) (inmates were entitled to relief under the Eighth Amendment where they proved threats to personal safety from exposed electrical wiring, deficient firefighting measures and the mingling of inmates with serious contagious diseases). In this case, however, the inmates' evidence did not begin to show what would be required to make out such a claim.6

III.

Due Process Challenges

In addition to the deliberate indifference due process

_____

6. In his testimony, Dr. Cohen merely made the general statement that infectious diseases develop commonly in prisons and spread quickly because of high population density. (App. Vol. I, p. 46). Although Dr. Cohen's general statement is not enough to support the inmates' Eighth Amendment claim, we do share his concern about the prison's blanket policy of charging fees for treatment for all contagious diseases. With diseases such as tuberculosis, the impact of delays in inmates' seeking treatment may cause serious health hazards. Cf. Commerce Justice State Appropriations: Hearings on National Institute of Justice Study on the

Health Needs of Soon-to-be Released Inmates Before the House
Subcommittee on Appropriations (statement of Edward A. Harrison,
President, National Commission on Correctional Health Care) 1997 WL
10571095 ("tuberculosis . . . is 500% more common in urban jails than
in the general population . . .; Hepatitis B virus, HIV and AIDS are all
widespread in the correctional environment"); Kim Marie Thorburn,
Health Care in Correctional Facilities, 163 Western J. Med. 50 (1995),
1995 WL 12613424 at *11-12 ("As the New York and California prison
system outbreaks show, overcrowded institutions, often with a high
proportion of immunosuppressed people, are fertile ground for the
spread of tuberculosis.").

19

claims made with respect to the pre-trial detainees,
plaintiffs contend that the challenged policy violates the
Fourteenth Amendment's Due Process Clause by "taking
inmate funds from inmate accounts without due process of
law." (Appellants' Br. at 26). The inmates argue that the
district court erred in rejecting both their procedural and
substantive due process challenges.

A. Procedural Due Process.  Inmates have a property
interest in funds held in prison accounts. E.g. , Mahers v.
Halford, 76 F.3d 951, 954 (8th Cir. 1996), cert. denied, 117
S. Ct. 696 (1997); Campbell v. Miller, 787 F.2d 217, 222
(7th Cir. 1986); Quick v. Jones, 754 F.2d 1521, 1523 (9th
Cir. 1985). Thus, inmates are entitled to due process with
respect to any deprivation of this money. Mahers, 76 F.3d
at 954. The inmates argue that, in deducting fees for
medical services from their inmate accounts, the Berks
County Prison program provides: (i) inadequate notice; (ii)
inadequate authorization procedures; and (iii) inadequate
post-deprivation process for challenging erroneous fee
assessments. (Appellants' Br. at 28).

The procedural protections required by the Due Process
Clause are determined with reference to the particular
rights and interests at stake in a case. Washington v.
Harper, 494 U.S. 210, 229 (1990). The factors to be
considered are the private interests at stake, the
governmental interests, and the value of procedural
requirements in that particular context. Id. (citing Mathews
v. Eldridge, 424 U.S. 319, 335 (1976)).

(i) Notice.  The inmates argue that Berks County
program provides deficient notice to the Hispanic
population of the prison because there is no written
Spanish translation of the fee-for-service program.
(Appellants' Br. at 29). This argument is essentially the
same as one of the arguments made by the inmates as part
of their submission that the program "as implemented"

results in constitutionally impermissible conditions of confinement. See supra at 12-13. Once again, we find the argument unpersuasive.

The amount of notice due depends on the context. Gilbert v. Homar, 117 S. Ct. 1807, 1812 (1997) ("Due Process is

flexible and calls for such procedural protections as the particular situation demands"). As noted, in assessing claims of due process violations, we look not only at the private interests at stake, but also at those of the government entity. Cafeteria and Restaurant Workers Union v. McElroy, 367 U.S. 886, 895 (1961).

The inmates claim inadequate notice because 10% of the inmate population can read only Spanish and there is no Spanish translation of the program description. As previously noted, however, the district court found that Spanish-speaking officers explain the policy to all the Spanish-speaking inmates and that there is always a Spanish-speaking officer on duty. Reynolds, 936 F. Supp. at 1222. In addition, the court found that the prison medical department employed at least three nurses who were fluent in Spanish. Id.

We agree with the district court that a Spanish translation of the Inmate Handbook would be useful. However, we discern no basis for holding that the failure to provide Spanish-speaking inmates with a written explanation of a prison policy, when the policy is orally explained by Spanish-speaking correctional officers, creates a constitutional violation. The constitutional issue is whether the inmates are provided adequate notice so as to be able to challenge any improper deprivation, not whether they are provided written notice. Cf. Lewis, 116 S. Ct. at 2182 (courts are to defer to prison officials to determine how best to ensure that inmates with language programs have adequate information and assistance).

(ii) Authorization.  With respect to authorization procedures, the inmates explain that "[a]uthorization to withdraw money from an inmate account occurs when an inmate is asked to sign a Berks County Medical Service Form when the assessment is made." (Appellants' Br. at 29-30). The inmates' complaint, made in cursory fashion, is that the medical fee "assessment occurs regardless of whether the inmate signs the form." (Id.)

We have already held that charging inmates for medical fees is not unconstitutional per se. See supra at 10.

Permitting a prison to charge fees to further legitimate

penological interests would be meaningless unless the prison implemented procedures to make the system work effectively. The inmates' argument appears to be that fees should not be deducted from their accounts without their own express authorization. But delaying treatment while prison officials haggled with an inmate about signing a form authorizing the assessment of a fee could lead to frustrating and hazardous Eighth Amendment problems. See Ancata, 769 F.2d at 704. Cf. Taylor v. Bowers, 966 F.2d 417, 423 (8th Cir. 1992) (doctor's delay of surgical intervention in order to prompt inmate to confess he swallowed a drug-filled balloon violated inmate's right to treatment of serious medical condition). And if there had to be a threshold hearing on the validity of a fee, that delay might exacerbate an inmate's already serious medical condition. Cf. Washington, 494 U.S. at 225 (holding a prison regulation with respect to the involuntary administration of anti-psychotic drugs without a prior hearing valid where the regulation was an accommodation between the inmate's liberty interests and the State's interest in providing appropriate medical treatment to reduce the danger that the inmate presented to both himself and others). Further, delays in treating a contagious disease could expose other inmates and prison officers to increased health risks. Hence, in order to have a fee system work practicably and at the same time provide medical services in a manner that does not constitute deliberate indifference to serious medical needs, a prison must have the ability to deduct fees from an inmate's account even when the inmate refuses to grant authorization. See Campbell, 787 F.2d at 224 (the practicality of needing to collect funds in the prison context is an important factor in determining whether the relevant procedures satisfy due process requirements). Put differently, our point is that if inmates know that they can refuse to pay, still receive treatment, and in the meantime spend their funds on other things, then it is likely that at least some prisoners will simply refuse to authorize deductions. Such refusals would undermine the ability of the prison to administer its fee-for-service program effectively.

In addition, we note that the deduction here is afixed, non-punitive assessment and that these features limit the

danger of the prison authorities' abusing the power to make unauthorized deductions. See Quick, 754 F.2d at 1523 (suggesting that when the deduction of money is non-punitive, less process is due). Moreover, this is not a situation in which the inmates are deprived of the benefits of their property and receive nothing in return; rather in exchange for the fees, the inmates receive the benefit of health care, the value of which undoubtedly exceeds the modest fee assessed. See Mahers, 76 F.3d at 954-55 (need for procedural due process safeguards is somewhat reduced where the deduction of money from inmates' accounts goes substantially to benefit the inmates' interests).

(iii) Hearing.  The inmates next argue that the "procedural aspects of the fee program fail to provide a meaningful way to challenge an alleged improper assessment." (Appellants' Br. at 31). As a basis for their claim, the inmates point to the Inmate Handbook. The Handbook states that an inmate who contests a fee assessment can file an Inmate Communication Form that will be reviewed by the Medical Department. (Appellants' Br. at 30). The crux of the inmates' claim concerns the filing of a grievance after initially contesting a fee. The inmates tell us that "an independent review beyond the Medical Department of a challenged assessment is essential." The inmates argue that this essential second level of independent review is missing. Specifically, the inmates point out that although the Inmate Handbook allows for a grievance to be filed when an Inmate is not satisfied with the results of his initial challenge, the Handbook states that "[a] grievance may not be filed simply because [one] disagree[s] with a staff member's decision." (Appellants' Br. at 31). The argument appears to be that this limited right to appeal to an independent body is constitutionally inadequate.

Even assuming that it is necessary for the inmates to have a right to appeal to an entity independent of that which issued the initial denial, i.e., the Medical Department, see McDaniels v. Flick, 59 F.3d 446, 459 (3d Cir. 1995) ("due process requires an impartial decision maker before final deprivation of a property interest"), cert. denied, 116 S. Ct. 1017 (1996), the inmates' claim faces a

23

barrier it cannot surmount, viz., the district court's finding that the rule that "a grievance may not be filed simply because one disagrees with a staff member's decision" does not apply to grievances about improper assessments under the fee-for-service program. Reynolds, 936 F. Supp. at

1228. The court found that such grievances may be filed because they fall under an exception allowed for "report[s] [of] alleged violations of jail policy." In view of this factual finding, the inmates' challenge can succeed only if they can show that the district court committed clear error.

"A finding of fact is clearly erroneous only if the court has the definite and firm conviction that a mistake has been committed." Coalition to Save Our Children v. Bd. of Education, 90 F.3d 752, 759 (3d Cir. 1996) (citation and internal quotation omitted). Deference to the factfinder is especially appropriate with respect to credibility determinations, since it is the fact finder, and not the court of appeals, that has the opportunity to hear and observe the witnesses first hand. In re Nautilus Motor Tanker Co., 85 F.3d 105, 116 (3d Cir. 1996) (district court's credibility assessments are "deserving of the highest degree of appellate deference"). Here, the testimony of the warden of the Berks County Prison directly supports the district court's finding. The inmates, however, point to what they say is contradictory testimony from the deputy warden. (Appellants' Br. at 31). The inmates' complaint boils down to a challenge to the district court's credibility determination. We do not see an adequate basis to reverse that determination.

In sum, we hold that the inmates have not demonstrated error in the district court's rejection of their procedural due process challenges.7

_____

7. The inmates also point to Pennsylvania statutes regulating the "taking by any agency of individual property rights." (Appellants' Br. at 32). The inmates argue that Pennsylvania's heightened procedural protections are not only entitled to deference, but also create a liberty interest that is entitled to protection. The district court's failure to acknowledge the Pennsylvania statutes and court decisions, the inmates say, was error. We disagree for two reasons.

First, even if Pennsylvania's heightened procedural protections were entitled to some deference, the deference is by no means conclusive --

24

B. Substantive Due Process.  The inmates claim that the Berks County Prison program violates substantive due process because it is too vague. Relying on Horn v. Burns and Roe, 536 F.2d 251, 254 (8th Cir. 1976), the inmates observe that "a noncriminal statute is unconstitutionally vague under the due process clause of the Fifth or Fourteenth amendments when its language does not convey sufficiently definite warning as to the proscribed conduct

when measured by common understanding or practice."
See also, e.g., Trojan Technologies, Inc. v. Com. of Pa., 916
F.2d 903, 914 (3d Cir. 1990). The inmates contend that the
program at issue here fails to meet this standard.

Plaintiffs' assertions, which mirror some of the
arguments made with respect to their unconstitutional-
conditions-of-confinement claim, are (a) that exceptions to
the fee assessment policy, such as for chronic illnesses and
emergencies, are not specifically defined and (b) that the
Inmate Handbook's statement that "[a] grievance may not
be filed simply because you disagree with a staff member's
decision" gives inmates the impression that they are not
entitled to seek an independent review of a challenged
medical fee assessment. We agree with the inmates that the
current description of the fee-for-service policy is not a
model of clarity. However, in order to show that the policy
violates due process it is not enough for the inmates to
demonstrate that more specific language could have been
used. Instead, the policy must be so vague as to amount to
the absence of any real policy or statute. Horn, 536 F.2d at
254.

We agree with the district court that the fee-for-service
program at Berks County does not violate this standard.
_____

as the inmates appear to suggest it should be -- in determining the
degree of procedural protection required under federal constitutional
standards. Indeed, the Eighth Circuit case that the inmates cite for the
proposition that deference is due was one where the majority upheld the
prison policy despite the fact that it was contrary to both state
legislative
policy and case law. See Mahers, 76 F.3d at 957 (Heaney, J., dissenting).
Second, with respect to the alleged creation of a liberty interest, a
state's
choice to provide heightened procedural protections does not create an
independent liberty interest. See Griffin v. Vaughn, 112 F.3d 703, 709
n.3 (3d Cir. 1997).

25

First, the terms "chronic illness" and "emergency" are
relatively clear in themselves, and their meaning is
illustrated with examples. Second, with respect to the right
to file grievances, there was testimony at trial that inmates
are informed twice of their right to grieve a fee assessment,
once at orientation and once again at the time when a fee
is assessed. (App. Vol. I, pp. 155-60; Vol. IV, pp. 1084-86).
In addition, the warden testified that inmatesfile grievances
pertaining to medical fees "all the time." (App. Vol. I, p.
157). Hence, the fee-for-service program, is not

unconstitutionally vague.

The inmates tell us that they "introduced a wealth of information that shows that serious mistakes go uncorrected [in the assessment of fees]." (Appellants' Br. at 37). The "wealth of information," however, apparently consists of testimony from four inmates that errors were made in assessing fees against them. We agree with the district court that this evidence is of negligible value in view of the scope of the entire program.

IV.

FIRST AMENDMENT

The inmates' final claim is that the district court erred in rejecting their claim that the program abridged their First Amendment right of meaningful access to the courts. See Bill Johnson's Restaurants, Inc. v. NLRB, 461 U.S. 731, 741 (1983). The inmates argue that charging them fees for medical services puts them to the impermissible choice of paying for legal expenses or paying for needed health care. See Gluth v. Kanga, 951 F.2d 1504, 1508 (9th Cir. 1991) (holding that putting inmates in the situation of having to choose between purchasing hygienic supplies or purchasing essential legal supplies was "unacceptable" under the Constitution's guarantee of meaningful access to the courts). In support of this argument, the inmates point to the fact that they are charged for photocopying and for mailing materials to the court.[8]

_____

8. The charge for photocopying appears to apply whether an inmate is indigent or not. With respect to mailing legal materials, however, indigent inmates are entitled to have all their legal material mailed by the prison, except that a negative balance is applied to their accounts. Reynolds, 936 F. Supp. at 1230.

26

In Section II, we analyzed the inmates' claim that charging them fees for medical services constituted deliberate indifference to their serious medical needs because it deterred them from seeking health care as promptly as they would in the absence of a fee. See supra at 14-17. The threshold issue in analyzing that claim was whether the claim was barred under Lewis v. Casey, 116 S. Ct. at 2179, because of a failure to show actual or imminent harm, i.e., the actual injury that would have provided standing to sue. We noted that Lewis arguably did not control because (a) Lewis was a First Amendment right-of-access to-the-courts case and (b) a prior Supreme Court

case, Helling v. McKinney, 509 U.S. 25, 33 (1993), squarely held, in the context of an Eighth Amendment deliberate indifference claim, that inmates could bring a claim based on an assertion that existing conditions of confinement created a serious health hazard and put them at an increased risk in the near future. We found it unnecessary to decide this question because the inmates' claims clearly failed on the merits. Here, however, the inmates' claim is a First Amendment access-to-the-courts claim that falls squarely within the ambit of Lewis.

Lewis involved a class action brought by adult prison inmates in Arizona, alleging that the prisons were depriving the inmates of their rights of access to the courts and counsel in violation of the First, Sixth, and Fourteenth Amendments. 116 S. Ct. at 2177. In particular, the inmates alleged inadequacies in their access to law libraries and legal assistance. Id. at 2179. Among the shortcomings in the facilities identified by the district court were inadequacies in the training of library staff, the updating of legal materials, and the availability of photocopying services. Id. at 2178. In rejecting the inmates' claims and reversing the district court's grant of an injunction in favor of the inmates, the Supreme Court explained that the Constitution gave the inmates no free-standing rights to a law library or legal assistance. Id. at 2179-80. The relevant right was the right of access to the courts. Id. at 2180. Legal assistance, photocopying services, and law libraries were merely means to achieving access to the courts. Id. Because there was no free-standing right to a law library or photocopying services, an inmate could not demonstrate

the necessary actual or imminent injury simply by establishing that those services were inadequate. Id. Instead, to be able to bring a viable claim, the plaintiff-inmates had to show direct injury to their access to the courts. Id. The Court explained that an inmate could show, for example, that "a complaint he prepared was dismissed for failure to satisfy some technical requirement which, because of deficiencies in the prison's legal assistance facilities, he could not have known." Id. "Or [he could show] that he had suffered arguably actionable harm that he wished to bring before the courts, but was so stymied by the inadequacies of the law library that he was unable even to file a complaint." Id.

The inmates' claim here suffers from the precise deficiencies identified by Lewis. The inmates argue that their access to the courts has been stymied as a result of having to pay for medical services and thereby having less

money to pay for legal mail and photocopying. However, there is no First Amendment right to subsidized mail or photocopying. Under Lewis, the inmates must point to evidence of actual or imminent inference with access to the courts -- for example, evidence that an inmate was not able to file his complaint in time because he could not afford the cost of postage or that an inmate was not able to file legal papers because he could not photocopy certain documents. Since the inmates have utterly failed to point to any evidence of such direct injury to their right of access to their courts, their First Amendment challenge fails.

V.

For these reasons, the judgment of the district court is AFFIRMED.

A True Copy:
Teste:

     Clerk of the United States Court of Appeals
     for the Third Circuit

28