**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 10-1728
_____

F. SCOTT WINSLOW,
                                        Appellant

v.

PRISON HEALTH SERVICES (PHS);
(PA) JENNIFER PORTA;
DR. RENATO DIAZ, (MD);
STANLEY STANDISH, (MD)

_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
(D.C. Civil No. 08-cv-00785)
District Judge:  Honorable Sylvia H. Rambo

_____

Submitted Under Third Circuit LAR 34.1(a)
January 11, 2011

_____

Before: SCIRICA, BARRY and VANASKIE, <u>Circuit Judges</u>

(Opinion Filed: January 20, 2011)
_____

OPINION
_____

BARRY, <u>Circuit Judge</u>

    F. Scott Winslow sued Prison Health Services ("PHS") and several of its

employees, alleging that he received constitutionally inadequate medical treatment for a hernia while incarcerated at SCI-Retreat, a Pennsylvania state prison. The District Court dismissed part of Winslow's case on Defendants' motion to dismiss and disposed of the remainder on Defendants' motion for summary judgment. Winslow appeals both decisions. We will affirm.

## I. Background[1]

### A. Facts Prior to February 22, 2008

On August 19, 2007, while working at SCI-Retreat, Winslow felt a "pop" and later noticed a lump in his groin. Eight days later, after treating himself with Ibuprofen, he reported to the medical staff. He was instructed to return the following day, and on August 28, 2007, he was examined by Defendant Jennifer Porta, a physician's assistant.

Porta diagnosed Winslow with a left inguinal hernia. While she believed that the hernia was reducible, she could not confirm this belief, as there was inadequate space for Winslow to recline. She prescribed Motrin, instructed him to avoid strenuous activity, and told him to sign up for sick call if his symptoms worsened.

On September 7, 2007, a prison nurse evaluated Winslow before he was to be placed in the Restricted Housing Unit ("RHU"). The nurse found no reason that he could not be placed in the RHU, and the nurse's notes are silent regarding pain or Winslow's hernia.

---

[1] The District Court had jurisdiction under 28 U.S.C. § 1331, and we have jurisdiction under 28 U.S.C. § 1291.

Several months elapsed before Winslow again sought treatment pertaining to the hernia. Indeed, when he was examined by Defendant Dr. Renato Diaz on January 14, 2008, for complications relating to his asthma, Winslow made no mention of his hernia. He did not again seek treatment for his hernia until January 18, 2008, when Porta saw him, confirmed that the hernia was reducible, and scheduled an examination with Defendant Dr. Stanley Stanish, sued here as Dr. Standish.

Dr. Stanish saw Winslow on January 28, 2008. His notes from that visit indicate that "since there is no evidence of incarceration or strangulation and when there is some drop thru there is a reduction, there is no need for surgical repair at this time." (App. 49.) Dr. Stanish prescribed Motrin, various restrictions on physical activity, and a hernia belt, noting that "[i]t is not what he wants but may be all he needs" and that "[b]y exam he is not in need of anything further." (*Id.* 50.) According to Winslow's deposition, Dr. Stanish informed him that "if you were on the street most HMOs and care facilities, they wouldn't address this situation [because] it's too costly." (*Id.* 140) Winslow further stated that Dr. Stanish "went into some spiel about, you know, they don't do that anymore and the management healthcare and the costs." (*Id.*)

Winslow returned to pick up his hernia belt on January 28, 2008. The available belt was too large, however, and so another was ordered. Before receiving his belt, Winslow was examined by Dr. Diaz on February 11, 2008. Dr. Diaz agreed that the hernia was reducible, and so he prescribed Motrin and ordered a scrotal support.

3

Winslow was seen by Porta on February 19, 2008, as he was complaining of pain in the left groin and difficulty with bowel movements. Porta prescribed Motrin and Metamucil. Three days later, on February 22, 2008, Winslow received his hernia belt.

### B. Facts After the Issuance of the Hernia Belt

Because the District Court dismissed Winslow's claims arising after he was issued a hernia belt on Defendants' motion to dismiss, it considered only the complaint's allegations pertaining to this period, the relevant portions of which are excerpted below:

> Following my family contacting the medical department I was finally issued a hernia belt that does nothing for the severe pain that I am in constantly.
>
> . . .
>
> The Defendants in this case specifically told me that they would not do anything for me until I was either being "strangled to death" or the hernia moves into my scrotum.
>
> Prison Health Services policies to save money and other policies are the direct and proximate cause of the deliberate indifference to my serious medical needs that I am being forced to endure.

(*Id.* 44.)

### C. Procedural History

Winslow filed suit on April 28, 2008, proceeding pro se. Defendants moved to dismiss, and on October 23, 2008, the District Court dismissed the complaint to the extent it raised claims after February 22, 2008, the date on which Winslow received his hernia belt.

After the partial denial of Defendants' motion, the District Court appointed

counsel on Winslow's behalf. Following discovery, Defendants moved for summary judgment, and the Court granted the motion on February 12, 2010. Winslow timely appealed.

## III. Discussion

### A. Applicable Law

The Eighth Amendment's prohibition of cruel and unusual punishment requires prison officials to provide basic medical treatment to inmates. *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976). Critically, however, "a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment," and so "malpractice does not become a constitutional violation merely because the victim is a prisoner." *Id.* at 106. Rather, a constitutional violation requires "deliberate indifference," which may be manifested by "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Id.* at 104-05 (footnote omitted). "[A]s long as a physician exercises professional judgment his behavior will not violate a prisoner's constitutional rights." *Brown v. Borough of Chambersburg*, 903 F.2d 274, 278 (3d Cir. 1990).

### A. Motion to Dismiss: Claims After February 22, 2008

#### 1. Standard of Review

A court may only grant a Rule 12(b)(6) motion where the plaintiff fails to plead

5

"enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A litigant's pro se status requires a court to construe the allegations in the complaint liberally. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007).

## 2. Analysis

Defendants moved to dismiss Winslow's complaint in its entirety, arguing that the allegations did not support a claim of deliberate indifference. The District Court agreed only in part, finding that once Winslow was issued a hernia belt, his claim became one of medical negligence, rather than indifference. In other words, the Court reasoned, while the complaint contained a plausible claim that Winslow was denied medical care outright prior to the issuance of the hernia belt, once he was issued the belt, he had pleaded no facts suggesting that Defendants "kn[ew] of and disregard[ed] an excessive risk to inmate health or safety." *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Rather, the Court explained, "Plaintiff may not agree with the treatment he is receiving, but that disagreement alone does not give rise to an Eighth Amendment claim." (App. 13)

Winslow argues on appeal that he did sufficiently plead deliberate indifference following the issuance of the hernia belt, as the decision to treat his hernia with a belt instead of with surgery was improperly motivated by non-medical factors, principally cost. As noted above, the complaint alleged that Winslow was harmed by DHS "policies to save money," (*id.* 44), and the denial of medical care, when based on non-medical factors, may violate the Eighth Amendment. *See Monmouth County Corr. Inst. Inmates*

6

*v. Lanzaro*, 834 F.2d 326, 346 (3d Cir. 1987) ("If necessary medical treatment is delayed for non-medical reasons, a case of deliberate indifference has been made out." (internal quotation marks and alterations omitted)). Nevertheless, the District Court correctly ruled that Winslow had failed to state a claim.

For one thing, the complaint's allegation that Winslow was harmed by "policies to save money" is exceedingly conclusory; the complaint does not provide any indication either of (1) what the relevant policies are, (2) what basis he has for thinking that "policies to save money" affected his medical treatment, or (3) what specific treatment he was denied as a result of these policies. More fundamentally, the naked assertion that Defendants considered cost in treating Winslow's hernia does not suffice to state a claim for deliberate indifference, as prisoners do not have a constitutional right to limitless medical care, free of the cost constraints under which law-abiding citizens receive treatment. *See Reynolds v. Wagner*, 128 F.3d 166, 175 (3d Cir. 1997) ("[T]he deliberate indifference standard of *Estelle* does not guarantee prisoners the right to be entirely free from the cost considerations that figure in the medical-care decisions made by most non-prisoners in our society."); *Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006) ("The cost of treatment alternatives is a factor in determining what constitutes adequate, minimum-level medical care, but medical personnel cannot simply resort to an easier course of treatment that they know is ineffective." (citations omitted)); *Caines v. Hendricks*, No. 05-1701, 2007 WL 496876, at *8 (D.N.J. Feb. 9, 2007) ("[I]t is not a

constitutional violation for prison authorities to consider the cost implications of various procedures, which inevitably may result in various tests or procedures being deferred unless absolutely necessary.").

Thus, because the complaint pleaded only that Winslow was subjectively dissatisfied with his medical treatment and alleged in the most conclusory terms that Defendants considered cost in providing his care, the District Court properly dismissed his claims arising after he was issued a hernia belt.

### B. Motion for Summary Judgment: Claims Before February 22, 2008

#### 1. Standard of Review

We review a district court's grant of summary judgment de novo, viewing the underlying facts in the light most favorable to the party opposing the motion. *Pa. Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995). A district court's grant of summary judgment is proper only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

#### 2. Analysis

The District Court ruled that the evidence pertaining to the period between August 27, 2007, when Winslow first complained of hernia symptoms, and February 22, 2008, when he was issued a hernia belt, could not support a finding of deliberate indifference. Specifically, it noted that after first complaining of hernia symptoms, Winslow did not

8

again seek medical care for the hernia until January 18, 2008. It also noted that each time that Winslow sought treatment for the hernia in 2008, he received treatment. Though the Court recognized that Winslow wanted his hernia to be treated surgically, it concluded that disagreement with a medical decision that the medical provider subjectively perceives to be reasonable does not give rise to a constitutional claim.

On appeal, Winslow returns to the argument that Defendants' refusal to order surgery was improperly influenced by non-medical factors. Thus, he relies on Dr. Diaz's alleged statement — made after the initiation of this litigation — that "we're not doing nothing for you" because it "costs too much money." (App. 149). He also points to Dr. Stanish's comment that if Winslow were not incarcerated, many HMOs would decline to cover this procedure. (*Id.* 140.)

Winslow is correct that there is some record evidence suggesting that Defendants considered the cost of his treatment, among other factors, in declining to order surgery. Yet the record is equally clear that Dr. Diaz and Dr. Stanish did not focus exclusively or even predominantly on cost and that the treatment that they ordered was consistent with their professional judgment. According to Porta, "Standard medical treatment for a reducible hernia would be pain relief, as well as monitoring, and just generally, you know, precautions, safety precautions as far as lifting goes." (*Id.* 90.) Dr. Stanish explained that he did not order surgery because Winslow's hernia was not strangulated or incarcerated, and thus that it could heal with a more conservative treatment. Finally, Dr. Diaz testified

that the standard treatment for an inguinal hernia was non-surgical, and that with proper treatment, a hernia could heal without surgical intervention.  Winslow challenges all of these statements, even offering an expert report contending that hernias generally require surgery.  Yet even if those persons who treated Winslow are incorrect about certain medical facts, negligence does not demonstrate a deliberate indifference to Winslow's medical needs.  As noted above, moreover, Winslow does not have a constitutional right to unlimited medical care of his choosing, free from all considerations of cost.  Accordingly, the District Court appropriately granted summary judgment to Defendants for claims arising prior to the issuance of a hernia belt.[2]

### III.  Conclusion

We will affirm the orders of the District Court.

---

[2] The District Court granted summary judgment to PHS on the additional ground that Winslow had failed to point to a specific practice or policy responsible  for his mistreatment.  Winslow does not challenge this holding on appeal.