Hopkins v. Warden, et al.          CV-04-030-M    05/20/04

**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE**


<u>Kenneth Hopkins</u>

    v.                                    Civil No. 04-30-M
                                         Opinion No. 2004 DNH 088
<u>Warden, NH State Prison, et al.</u>


**REPORT AND RECOMMENDATION**


Plaintiff Kenneth Hopkins, an inmate at the New Hampshire
State Prison for Men ("NHSP"), brought this suit against Jane
Coplan, NHSP Warden, and a number of state corrections officials
pursuant to 42 U.S.C. § 1983 (document no. 4).[1]  Hopkins alleges
that he has suffered numerous and repeated retaliatory acts by
NHSP staff, intentional indifference to his safety and serious
medical needs, and violation of his due process rights.  These
acts allegedly stem from Hopkins' participation in a 1992
investigation that led to the termination of NHSP staff members
who were embezzling funds from inmate accounts.  Hopkins claims
that the defendants have violated his rights under the First,

---

[1]The following individuals are also named as defendants:
Phil Stanley, former Commissioner of the New Hampshire Department
of Corrections, Viola Lunderville, former NHSP Director of
Security, Marilee Nihan, former NHSP Director of Programs and
Acting Warden, C.O. Topham, C.O. Turcott, C.O. Edsel, Lt.
Thibeault, Sgt. Desmond, and Cpl. LaFlamme.

Fifth, Eighth and Fourteenth Amendments to the United States Constitution.  He seeks compensatory and punitive damages, a declaratory judgment and injunctive relief.  I address my preliminary review of Hopkins' complaint in part I of this document.  In part II of this document, I address an objection and five motions brought by defendants.

I

<u>Standard of Review</u>

Under this court's local rules, when an incarcerated plaintiff commences an action <u>pro</u> <u>se</u> and <u>in</u> <u>forma</u> <u>pauperis</u> the magistrate judge is directed to conduct a preliminary review and to prepare a report and recommendation determining whether the complaint or any portion thereof should be dismissed because:

> (I) the allegation of poverty is untrue, the action is frivolous, malicious, or fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief under 28 U.S.C. § 1915A(b); or

> (ii) it fails to establish subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1)

Local Rules of the United States District Court for the District of New Hampshire, LR 4.3(d)(2).  In conducting the preliminary review, the Court construes <u>pro</u> <u>se</u> pleadings liberally.  <u>See</u> <u>Ayala Serrano v. Gonzalez</u>, 909 F.2d 8, 15 (1st Cir. 1990), citing

2

Estelle v. Gamble, 429 U.S. 97, 106 (1976). The Court accepts the plaintiff's factual assertions, and all reasonable inferences that may be drawn therefrom, as true, but does not credit bald assertions or unsupported conclusions. See Aulson v. Blanchard, 83 F.3d 1, 3 (1st Cir. 1996).

Hopkins filed his complaint pursuant to 42 U.S.C. § 1983. To state a claim under § 1983, a plaintiff must allege two elements: (1) that a right secured by the Constitution or laws of the United States has been violated, and (2) that the violation was committed by a person acting under color of state law. See West v. Atkins, 487 U.S. 42, 48 (1988). The allegations that are most pertinent to Hopkins' claims are discussed next.

Background

A.   Investigation Into Staff Embezzlement

In early 1992, defendant Lunderville enlisted Hopkins' assistance in an investigation into possible staff embezzlement of inmate canteen funds. Compl., ¶ 8. Hopkins agreed to participate in the investigation as long as his identity was kept confidential and his safety was not put in jeopardy. Id., ¶ 9. Lunderville arranged for Hopkins to get the job of recreation clerk, which at the time included overseeing the accounting of

3

inmate canteen funds.  Id.  In that position, Hopkins was able to identify the embezzlers and the means that they used to wrongfully obtain funds.  Id.  As a result of the embezzlement investigation, NHDOC terminated former Administrator of Recreation Bruce Wright, his assistant Bill Woodson, and a female bookkeeper.  Id., ¶ 18.  Hopkins believes that some members of the corrections staff resented his involvement in an investigation disclosing staff misconduct.  Id., ¶ 11.

B.   Beginning of Staff Retaliation

After the embezzlement investigation was complete, Hopkins was placed into pending administrative review status and moved to the prison's Reception and Diagnostic ("R&D") Unit for his protection.  Id., ¶ 10.  At that time Warden Coplan was the R&D unit manager.  Id.  Coplan retaliated against Hopkins by issuing him three unwarranted disciplinary reports, which were quashed by Major Guimond.  Id., ¶ 17.  Hopkins was moved to the prison's Special Housing Unit ("SHU") to protect him from Coplan.  Id. Hopkins was later transferred from SHU to the Valley Street Jail in Manchester, and then transferred to the Massachusetts prison system, where he remained for the next six years.  Id., ¶ 19. Hopkins' "informant-against-staff" status was not kept

4

confidential as Hopkins was told countless times by Massachusetts correctional officers that they knew about his involvement in the NHSP investigation. Id., ¶ 20.

C.    Return to the New Hampshire Prison System

Hopkins was returned to NHSP permanently in October 1998. Id., ¶ 25. In December 1998, Hopkins was moved to Medium Custody South ("MCS"). Id. Hopkins was informed by defendant C.O. Topham: "Don't get too comfortable because you're not staying in this unit very long. We were warned about you and your involvement in the canteen incident in the early 90's." Id., ¶ 26. Months of harassment by C.O. Topham, Cpl. Washburn and C.O. Bohannan followed during which Hopkins was given at least eight major disciplinary reports, all of which were later dismissed or downgraded by reviewing officers. Id., ¶ 28. Hopkins alleges that defendant Marilee Nihan told him that he was the victim of retaliatory harassment and that it would stop. Id., ¶ 32.

Hopkins believes that C.O. Topham was eventually dismissed from his position after an investigation by Cpl. Keith Saunders revealed that Topham refused to inform Hopkins that Hopkins' seventy-five year old mother had arrived for a visit and was waiting for an hour. Id., ¶¶ 33-35. Soon after Topham left,

5

Hopkins was told by an officer that many staff in MCS "have it in for you and want you moved to H-building where you can be dealt with." Id., ¶ 36. Hopkins was later designated for transfer from MCS to H-building purportedly because of the eight unwarranted disciplinary reports that he had received, and for failing to show up on time for a classification hearing even though his notice did not specify the time that he was supposed to appear. Id., ¶¶ 37-40. Less than five months later, Hopkins was moved from MCS to H-Building where he was initially housed only with "prey" inmates.[2] Id., ¶ 41.

In December 2001, defendant C.O. Turcott informed Hopkins that, "[w]hat happened in South Unit, with that other officer, has not gone unnoticed." Id., ¶ 42. Several days later, Turcott returned and told Hopkins in front of his cellmate that he was going to "come back and tear the [expletive] out of this cell." Id. Turcott later returned to fulfill his threat, and issued Hopkins a disciplinary report for having a "strange odor in pen." Id., ¶ 43. That disciplinary report was dismissed. Id., ¶ 44.

On December 9, 2001, Turcott arranged for Hopkins to be

_____

[2]Inmates at NHSP are categorized as "predators," "prey" or "normal." Prey inmates in particular are housed separately from predator inmates to protect the prey inmates from the more dangerous and aggressive predator inmates.

6

moved from B-pod to D-pod, a cell with inmates who were classified both as predators and prey. Id., ¶ 41, 44. Hopkins complained about his assignment to D-pod to Counselor Matt Wall, Cpl. LaFlamme, Unit Manger Thyng, Sgt. Desmond, Lt. Thibeault, and Marilee Nihan. Id., ¶¶ 5, 45-48. Hopkins was assured by Cpl. LaFlamme, Sgt. Desmond, and Lt. Thibeault that the situation would be rectified.

D. Hopkins Is Set Up To Be Attacked

When Hopkins was housed in cell D-8 on D-pod, he noticed that one of the inmates in his cell was given extraordinary access to a rotunda area between pods whenever Turcott was on duty. Id., ¶ 49. That inmate, Jamie Bezanson ("Bezanson"), was permitted to go to the doors of other pods, and he usually returned with a bag of canteen items. Id. According to Hopkins, the word amongst inmates was that Bezanson was acting as a "bookie" and was selling tobacco contrary to prison rules. Id. ¶ 50. Bezanson was never questioned about the bags he carried, which, according to Hopkins, demonstrated that he had a "special relationship" with Turcott. Id.

Several days after being housed in cell D-8, Hopkins asked defendant LaFlamme about being returned to B-pod. Id., ¶ 51.

7

LaFlamme forced Hopkins to confront Turcott with Hopkins' allegations that Turcott had wrongfully moved him.  Id., ¶¶ 51-52.  When Hopkins attempted to discuss the issue, LaFlamme kept interrupting and finally told Hopkins that although there was "no reason" for Hopkins to have been moved, Turcott did not feel that Hopkins belonged on B-pod, and LaFlamme stood by Turcott's decision.  Id.

Ten minutes after Hopkins' meeting with LaFlamme and Turcott ended, Bezanson was summoned to a lieutenant's office over the loudspeaker.  Id., ¶ 53.  When Bezanson returned a few minutes later he screamed at Hopkins, "You are a [expletive] rat," and threatened Hopkins with a serious beating.  Id.  Bezanson then announced before a room full of witnesses that Hopkins had reported that Bezanson was harassing, bullying and extorting other inmates in cell D-8.  Id.  Hopkins denied Bezanson's allegation and left to confront Turcott about inciting Bezanson.  Id.  Another inmate, Paul Little, later explained to Bezanson how Hopkins had been involved in the investigation into staff embezzlement, and how Hopkins had suffered harassment from staff members thereafter.  Id., ¶ 55.  Bezanson commented that "Turcott must want to jam [Hopkins] up."  Id.

8

Hopkins wrote to defendant Nihan to inform her of the continuing staff harassment. Id., ¶ 56. While Nihan had told Hopkins that if he experienced any more retaliation to contact her immediately, she responded to his December 17, 2001 inmate request slip with the comment: "Your Unit CC/CM can help you w/ whatever your needs are. Please use him." Id., ¶ 57.

E.   Hopkins Is Severely Beaten

On January 5, 2002, Scott McAuley ("McAuley"), an inmate in cell D-8, called Hopkins a rat. Id., ¶ 58. Bezanson and inmate Henry Thomas were in the cell at the time. Id., ¶ 59. Hopkins demanded that McAuley apologize, and McAuley did so. Id., ¶ 58. When Hopkins turned to walk away, however, McAuley jumped onto Hopkins from behind slamming Hopkins to the ground. Id. Hopkins' face and forehead hit the concrete floor. Id. While he was on the floor, McAuley began beating Hopkins with his fists. Hopkins lost consciousness. Id. Hopkins alleges that Bezanson later bragged that while McAuley beat Hopkins, inmate Thomas stomped and kicked him. Id., ¶ 60. Hopkins believes that Bezanson lifted Hopkins up while Hopkins was unconscious so that McAuley could repeatedly punch Hopkins in the face. Id., ¶ 61. Hopkins later recalled momentarily regaining consciousness and

9

hearing Bezanson say, "I can't believe he's still breathing."
Id., 62. When Hopkins awoke later on someone was holding him in
the shower. Id., ¶ 63. He was naked. Id. Inmate Paul Little
arrived and assisted him. Id. Hopkins' face was rapidly
swelling and he was incoherent and unresponsive. Id.

Bezanson directed inmates to clean up the cell and discard
the evidence of the beating. Id., ¶ 64. Hopkins was given clean
clothes and directed to hide his face from view during the inmate
count. Id., ¶ 66. Bezanson refused to allow Hopkins to leave
the room even though inmate Little argued that Hopkins needed
medical attention. Id. Hopkins was later ordered by an officer
to leave the cell to go pick up his legal mail. Id., ¶ 68.
Hopkins wore a hooded sweatshirt to conceal his face. Id.

When Hopkins arrived to pick up his mail, his appearance
caused the officers to erupt into exclamations of disbelief.
Id., ¶ 69. The officers took him into the office and immediately
escorted him to the infirmary. Id. Hopkins injuries were
extensive, including bruising all over his face, a broken wrist,
blurred vision, and other post-concussion symptoms. Id., ¶¶ 70-
73. He visited the infirmary several times for post-concussion
symptoms during the following weeks, but eventually Dr. Friedman

10

accused Hopkins of being a "whiner" and refused to see him after February 5, 2002. Id., ¶ 73.

On April 3, 2002, Hopkins was admitted for observation in the infirmary after a physical therapist noticed that Hopkins was having neurological problems. Id., ¶ 74. At 10:00 p.m. that evening, Hopkins' involuntary twitches and spasms got so bad that he was transported to Concord Hospital. Id. Emergency brain surgery was performed on April 4, 2002 after CT-scan with dye revealed a subdural hematoma. Id. Hopkins alleges that the surgeon told him that he would have died within twenty-four hours if he had not been treated. Id.

F.   Cover Up By Prison Staff

Hopkins alleges that the medical staff who examined Hopkins, and every correctional officer who saw him after January 5, 2002, recognized that Hopkins had received a beating. Id., ¶¶ 75-76. Medical staff observed that Hopkins had no defensive marks. Id., ¶ 75. On January 6, 2002, Officer Leitner asked Hopkins to explain what happened. Id., ¶ 77. Hopkins stated that his roommates told him that he had fallen in the shower. Id. Leitner then stated, "We already know what happened; we know all the people involved; and you did not get this from falling in the

shower; and it is not the result of a one-on-one fight; you were given a severe beating by no less than three or four people. In all the time I have worked here, you are without doubt the worst that I have seen. Please do not insult my intelligence." Id. (emphasis in original). C.O. Pellitier also told Hopkins while making rounds, "Don't worry Hopkins; we know all of the people involved. They are not getting away with this and they will be punished severely." Id., ¶ 78 (emphasis in original).

Hopkins was surprised to learn days later from Lt. Thibeault that Officer Leitner had written a disciplinary report on Hopkins for being involved in a one-on-one fight. Id., ¶ 79. Lt. Thibeault told Hopkins that he did not "buy that scenario" and that it was evident to him that Hopkins had been the victim of a severe beating. Id. Lt. Thibeault also assured Hopkins that the disciplinary report would likely be ripped up. Id. On January 11, 2002, however, Lt. Thibeault gave Hopkins Disciplinary Report # 02-01-67 accusing Hopkins of using provoking words or gestures and fighting. Id., ¶ 80. Hopkins asked Lt. Thibeault why the disciplinary report was not ripped up. Id. Lt. Thibeault informed Hopkins that there were now three confidential informants providing information that served as the basis for the

disciplinary report.  Id.  Hopkins responded that there had not been three independent people in the room when the beating took place.  Id.  Lt. Thibeault replied, "How do you know who was in the room?  You don't remember anything."  Id.  Hopkins pled not guilty.  Id.  Hopkins complains that Lt. Thibeault did not record Hopkins' comments that (1) several correctional officers believed that Hopkins had been beaten; (2) defendant Turcott had given Bezanson a false "tip" that incited Bezanson; (3) McAuley admitted to jumping Hopkins from behind; (4) Hopkins was unconscious during the beating; (5) Hopkins' cellmates asked him to move out because he would not agree to adopt their story that he was in a one-on-one fight; (6) medical staff stated that Hopkins had no defensive marks; and (7) that marks on Hopkins' upper arms showed that someone held him from behind while he was beaten.  Id., ¶ 81.  Hopkins alleges that prison staff consistently refused to add any of the above facts to the written record.  Id., ¶ 82.

When Hopkins received notice of a hearing on January 14, 2002, he requested a continuance to secure copies of medical records, contact his attorney, and secure witnesses.  Id., ¶ 82. His request for a continuance was denied.  Id.  The only witness

13

that Hopkins was permitted was inmate Paul Little.  Id., ¶ 83.

Sgt. Morin, the hearing officer, declined to accept Little's

written statement about the coverup by inmates after the beating.

Id.  The charge against Hopkins of using provoking words or

gestures was dropped to an incident report, but he was found

guilty of fighting.  Id.  Hopkins alleges that Sgt. Morin

informed him that as a result of his finding Hopkins would be

held liable for restitution for his medical expenses.  Id.

Hopkins has received restitution bills for $454.84 on February

21, 2002 and for $777.78 on March 27, 2002.  Id.

Hopkins appealed the hearing officer's decision to an

unspecified Major on February 6, 2002.  Id., ¶ 84.  That appeal

was denied.  Id.  Hopkins further appealed to Warden Coplan on

March 11, 2002.  Id.  After receiving no response, he appealed to

Commissioner Stanley on April 1, 2002.  Id.  Hopkins alleges that

his former attorney, Michael Sheehan, was supposed to contact the

Warden and Commissioner to get copies of their responses to the

appeal, but those responses were never provided to Hopkins.  Id.

F.   Move to SHU

On December 2, 2003, C.O. Dunnack had Hopkins moved to the

Special Housing Unit ("SHU") without providing him any reason.

Id., ¶ 93. Soon after arriving in SHU, Hopkins began having severe abdominal pain. Id., ¶ 94. Hopkins alerted C.O. Edsel, who refused to call a nurse or provide Hopkins with any of the normal amenities provided to inmates moved to SHU such as toilet paper. Id. C.O. Edsel later watched as Hopkins was writhing in pain. Id. When a nurse made her rounds later that evening she immediately determined that Hopkins needed to be taken to the infirmary. Id. Hopkins had to be catherized and drained of 1100 cc of urine, the source of the pain. Id. Hopkins was taken to an outside hospital after that incident, and Hopkins ended up being housed in the infirmary for two weeks. Id., ¶ 95. While he was in the infirmary, classification staff allegedly told Hopkins that they could not determine why he was moved to SHU, and he was moved back to MCS. Id.

## Discussion

There can be no reasonable dispute in this case that the defendants have acted under color of state law, so the Court does not address that element of Hopkins' § 1983 claims further. The Court focuses on the alleged violations of Hopkins' rights under the Constitution or the laws of the United States.

15

A.   Retaliation Claims

"[A]n otherwise legitimate and constitutional government act can become unconstitutional when an individual demonstrates that it was taken in retaliation for his exercise of First Amendment speech."  Anderson v. Davila, 125 F.3d 148, 161 (3d Cir. 1997). A cognizable retaliation claim has three elements: (1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between the plaintiff's protected conduct and the defendant's adverse action.  See Thaddeus-X v. Blatter, 175 F.3d 378, 394 (6th Cir. 1999); see also Shabazz v. Cole, 69 F. Supp. 2d 177, 197 (D. Mass. 1999) (to sustain a claim of retaliatory discipline, a plaintiff must first show that the disciplined conduct was constitutionally protected).  Where a plaintiff shows that his protected conduct was a substantial or motivating factor for the defendant's actions, the burden shifts to the defendant to show that he would have reached the same decision even in the absence of the protected conduct.  Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977); Shabazz, 69 F. Supp. 2d at 197 (citing Graham v.

16

Henderson, 89 F.3d 75, 79 (2d Cir. 1996)).

Taking the facts alleged in the complaint as true, defendant Turcott retaliated against Hopkins by moving him to cell D-8 with the intention of putting Hopkins in danger. Turcott acted on that intention by defaming Hopkins to an inmate for the purpose of inciting an attack on Hopkins. Compl., ¶ 103. Although prison officials could freely move Hopkins within the prison, they could not do so for a retaliatory reason. See McDonald v. Hall, 610 F.2d 16, 18 (1st Cir. 1979) (recognizing an inmate's section 1983 retaliatory transfer claim). For purposes of preliminary review, I find that Hopkins has stated a cognizable claim that defendant Turcott retaliated against him by moving him to a cell where his safety was jeopardized in response to Hopkins' protected activity of speaking to prison administrators about staff misconduct. I further find that Hopkins has adequately pled state tort claims for assault and battery against defendant Turcott, whose malfeasance Hopkins alleges directly led to him being severely beaten.

Hopkins further alleges in the complaint that he received retaliatory disciplinary reports from defendants Coplan, Topham and Turcott. He states in his complaint, however, that those

17

reports were either dismissed or reduced to incident reports. Hopkins has not alleged any actionable harm that directly resulted from the allegedly retaliatory reports.[3]  I find that Hopkins' claims against defendants Coplan, Topham and Turcott for writing retaliatory disciplinary reports against him fail to state a claim upon which relief may be granted.

B.   Deliberate Indifference Claims

The Eighth Amendment provides that: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."  U.S. Const. amend. VIII.  An Eighth Amendment claim arises only if an official inflicts "cruel and unusual punishment" by knowing of and disregarding "an excessive risk to inmate health or safety."  Farmer v. Brennan, 511 U.S. 825, 837-838 (1994).  In accordance with the Eighth Amendment, prison officials must "ensure that inmates receive adequate food, clothing, shelter, and medical care, and must take reasonable measures to guarantee the safety of the inmates."

––––––––––––––––––––––

[3]The Court notes that Hopkins alleges that he was moved from MCS to H-Building in April 2000 based in part on the disciplinary reports that he received from defendant Turcott, Compl., ¶¶ 37-41, but Hopkins has not alleged that any of the defendants were responsible for that transfer.

18

<u>Farmer</u>, 511 U.S. at 832 (internal quotations omitted).[4]

Prison officials have not been deliberately indifferent if they responded reasonably to a risk to an inmate's health or safety. <u>Farmer</u>, 511 U.S. at 844; <u>Burrell v. Hampshire County</u>, No. 02-1504, 2002 WL 31218304 at *5 (1st Cir. Oct. 4, 2002). A reasonable response defeats the claim of a constitutional violation. <u>Burrell</u>, 2002 WL 31218305 at *5.

1. <u>Failure to Take Reasonable Measures to Guarantee</u>
<u>Hopkins' Safety</u>

Prison officials have a duty to take reasonable measures to ensure the safety of inmates. <u>Hudson v. Palmer</u>, 468 U.S. 517, 526-527 (1984). Hopkins claims that defendants Lunderville, Nihan, Coplan, Stanley, Cpl. LaFlamme, Sgt. Desmond, and Lt. Thibeault violated his Eighth Amendment rights by failing to take steps to protect him from harm caused by staff retaliation. Compl., ¶¶ 99-101. Hopkins alleges that the defendants' failure to prevent staff retaliation, and to protect him from harm, led to him being set up to be attacked by defendant C.O. Turcott. Reading the complaint generously, I find that Hopkins has alleged that each of the defendants was aware of the existence of staff

_____

[4]The Fourteenth Amendment makes the Eighth Amendment applicable to state actors, such as NHSP officials. <u>See</u> <u>DesRosiers v. Moran</u>, 949 F.2d 15, 17 (1st Cir. 1991).

19

retaliation against him, and that they deliberately ignored the risk of harm to him. For purposes of preliminary review, I find that Hopkins has stated Eighth Amendment claims for failing to protect him upon which relief may be granted against defendants Lunderville, Nihan, Coplan, Stanley, Cpl. LaFlamme, Sgt. Desmond, and Lt. Thibeault.

2. Delay of Necessary Medical Care

To state an Eighth Amendment claim premised on inadequate medical care, a prisoner must allege two elements. The prisoner must allege (1) acts or omissions by prison officials sufficiently harmful to evidence "deliberate indifference," to the prisoner's (2) "serious medical needs." See Estelle v. Gamble, 429 U.S. 97, 106 (1976). In order to be found deliberately indifferent, a prison official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id.; see also, Farmer, 511 U.S. at 837. Deliberate indifference may be manifested by prison doctors in their response to the prisoner's needs or by prison personnel "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed."

20

Estelle, 429 U.S. at 104-05. With regard to the second element, "[a] 'serious medical need' is one 'that has been diagnosed by a physician as mandating treatment, or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" See Mahan v. Plymouth County House of Corr., 64 F.3d 14, 17-18 (1st Cir. 1995)(quoting Gaudreault v. Salem, 923 F.2d 203, 208 (1st Cir. 1990)).

Hopkins alleges that his need for medical attention was obvious because he was writhing in pain. He further alleges that defendant Edsel was aware of his need for medical attention, and that defendant Edsel acted with deliberate indifference to his health. Compl., ¶ 105. Edsel's indifference resulted in Hopkins having to be taking an outside medical facility for treatment. Hopkins further alleges that the delay in medical treatment led to him having to be catherized for the following week. I find that Hopkins has adequately stated an Eighth Amendment claim upon which relief may be granted against defendant Edsel for intentionally delaying or denying him access to medical care.

C.   Due Process Claims

Hopkins claims that defendants Thibeault, Coplan and Stanley violated his rights to substantive and procedural due process by

21

participating in "the obstruction of justice."  Compl., ¶¶ 100,

104.  The facts alleged in the complaint that appear to be

relevant to Hopkins' due process claims pertain to the

disciplinary proceedings against him.[5]

Hopkins complains that defendant Thibeault failed to include

facts that Hopkins wanted in the administrative record that

showed that Hopkins was not involved in a one-one-one fight.

Hopkins further complains that defendants Coplan and Stanley

failed to take corrective action after his appeals.

The Fourteenth Amendment to the United States Constitution

prohibits a state from depriving a person of life, liberty or

property without due process of law.  U.S. Const. amend. XIV.  In

Sandin v. Conner, 515 U.S. 472 (1995), the Supreme Court greatly

curtailed cognizable prisoner due process claims by finding that

a prisoner's liberty interest is "generally limited to freedom

from restraint which, while not exceeding the sentence in such an

unexpected manner as to give rise to protection by the Due

---

[5]Defendants LaFlamme and Desmond are named along with defendant Thibeault in a paragraph that claims that Hopkins' due process right were violated.  See Compl., ¶ 104.  Hopkins has not alleged any facts in the complaint that may be construed as demonstrating that defendants LaFlamme and Desmond participated in the disciplinary proceedings against him.  Therefore, I find that Hopkins has failed to alleged facts that state due process claims against defendants LaFlamme and Desmond.

22

Process Clause of its own force, . . . nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Id. at 484 (internal citations omitted).[6] Here, Hopkins has not alleged facts that show that the disciplinary hearing led to his freedom being restrained in a manner that imposed an atypical and significant hardship on him. Rather, Hopkins complains that he was required to pay restitution for his medical expenses. Id., ¶ 83. It appears, therefore, that no protected liberty interest within the meaning of Sandin has been implicated here.

Hopkins has also claimed that the defendants' acts have violated his right to substantive due process. To demonstrate a substantive due process violation, a plaintiff must show either that a specific liberty or property interest protected by the Fourteenth Amendment has been violated, or that the state's conduct "shocks the conscience." Brown v. Hot, Sexy & Safer Prods., 68 F.3d 525, 531 (1st Cir. 1995); Coyne v. Somerville, 972 F.2d 440, 443 (1st Cir. 1992).

---

[6]In her dissenting opinion in Sandin, Justice Ginsburg criticized the majority's holding for focusing on the result of the hearing. Sandin, 515 U.S. at 489 n.1 ("One must, of course, know at the start the character of the interest at stake in order to determine then what process, if any, is constitutionally due. 'All's well that ends well' cannot be the measure here.").

While prisons have a constitutional obligation to provide inmates access to medical care, inmates do not have a constitutional right to receive free medical care.  See Revere v. Mass. Gen. Hosp., 463 U.S. 239, 245 (1983); Reynolds v. Wagner, 128 F.3d 166, 174 (3d Cir. 1997) (prisoner co-payment plan does not violate the Eighth Amendment); Martin v. DeBruyn, 880 F. Supp. 610, 615 (N.D. Ind. 1995), aff'd, 116 F.3d 1482 (7th Cir. 1997) ("The Eighth Amendment guarantees only that states will not ignore an inmate's serious medical needs; it does not guarantee free medical care.").  Therefore, Hopkins cannot show that a specific liberty or property interest has been violated by the requirement that he pay restitution for his medical expenses.

Under the second strand of substantive due process violations, Hopkins must allege facts that demonstrate that the state's conduct "shocks the conscience."  This requires that the state's conduct "offend[s] the community's sense of fair play and decency," and must "do more than offend some fastidious squeamishness or private sentimentalism."  Rochin v. California, 342 U.S. 165, 172-173 (1952).  The threshold for alleging such claims is high.  See Brown, 68 F.3d at 532.

It cannot be said that requiring an inmate who has been

24

found guilty of fighting to pay for his own medical expenses for the treatment of injuries sustained in the fight "shocks the conscience." Such an outcome appears to be a reasonable deterrent to prohibited conduct. In Hopkins' particular case, the guilty finding against him stands. Hopkins may not appeal that administrative determination in a § 1983 due process claim in federal court. See Edwards v. Balisok, 520 U.S. 641 (1997) (prohibiting § 1983 claims for declaratory relief and damages based on challenges to procedural defects in prison disciplinary procedures that necessarily imply the invalidity of the punishment imposed unless the plaintiff can first show that the guilty finding against him has been overturned).[7] Accordingly, I find that Hopkins has not stated a substantive due process claim upon which relief may be granted. Consequently, I recommend that Hopkins' due process claims be dismissed from this action.[8]

---

[7]To the extent that Hopkins has no available avenue for reconsideration of his appeal within the Department of Corrections, Hopkins' recourse lies in a lawsuit brought in the state courts, or before the state's board of claims. See N.H. Rev. Stat. Ann. 541-B:9(II) & (IV), and 541-B:14 (1997) (providing a post-deprivation means of recouping property loss attributable to the state).

[8]As discussed in detail infra, this recommendation does not mean that the Court is not concerned about the fairness and result of Hopkins' disciplinary hearing.

II

Pending Motions

Shortly after filing his complaint, Hopkins filed a motion for a preliminary injunction (document no. 5). A hearing on that motion was held over two days on February 18 and 20, 2004. The Court recommended that the motion be denied in a report and recommendation dated April 30, 2004 (document no. 19).

During the preliminary injunction hearing, the Court issued oral orders to the defendants requiring the production of the confidential informant statements cited by the hearing officer in Hopkins' disciplinary hearing and Hopkins' medical records. In response to those orders, the defendants filed the following pleadings: (1) an ex parte objection to this Court's order that the defendants produce the confidential informant statements (document no. 13); (2) a motion to seal the ex parte objection (document no. 14); (3) a motion to provide Hopkins' updated medical records (document no. 15); (4) a motion to seal Hopkins' medical records (document no. 16); (5) a motion to provide the court with the identities of individuals identified as confidential informants, and (6) a motion to seal the same (see unmarked documents submitted with document no. 18). I address

these pleadings seriatim.

A. <u>Pleadings Pertaining to Confidential Informants</u>

    1. <u>Ex Parte Objection</u>

On February 18, 2004, during the first day of the preliminary injunction hearing, plaintiff testified that he was severely beaten by inmates McAuley, Bezanson and Thomas. Plaintiff alleged that inmates on his pod acted to cover up the beating and told Hopkins that he should tell prison staff that he fell in the shower. Hopkins then alleged that the inmates later attempted to persuade him to adopt their story that he was engaged in a one-on-one fight with McAuley, which Hopkins refused to do. Hopkins next testified about his interview with Lt. Thibeault regarding the incident, his disciplinary hearing, and his claims of unanswered appeals to Warden Coplan and Commissioner Stanley.

Hopkins did not offer any evidence at the hearing against defendants Thibeault, Coplan, and Stanley pertaining to the beating of January 5, 2002, or the actions taken thereafter, that would justify a preliminary injunction prohibiting retaliatory conduct against those defendants. Nevertheless, defendants' counsel pursued the matter of the evidence presented during

Hopkins' disciplinary hearing on cross-examination of Hopkins and with her own witnesses. During cross-examining of Hopkins, the following exchange occurred:

Q. And you don't know what the confidential informants told the hearing officer at the disciplinary hearing, do you?

A. All he said is they had three eyewitnesses.

Q. Listen to my question. You don't know what the confidential informants told the hearing officer?

A. I don't know, I don't know. According to what he told me they didn't tell him anything. He said he had -- he said that there were three statements.

Q. And I'm just trying to establish, you don't know what those were?

A. No.

Draft Transcript of Hearing Held on February 18, 2004.

The Court asked defense counsel what defendants' position would be when Hopkins requested discovery of the identities of the confidential informants. Despite her inquiry on cross-examination, defense counsel indicated that the prison had security concerns about revealing the identities of the

confidential informants. Counsel requested that the Court consider the confidential informant statements in camera. See Dfs.' Ex Parte Obj. at 2. The Court informed the defendants that if they wanted to rely on the confidential statements to defend against Hopkins' claims, then those statements would become part of the public record and available to the plaintiff. Defense counsel responded that the defendants would not enter the confidential informant statements into evidence, or pursue the matter further. Id. at 2-3.

For reasons not clear to the Court, on the next day of the hearing defendants again tried to buttress their arguments by reference to the confidential informant statements. The following exchange occurred during the direct testimony of Lt. Thibeault:

Q. Did you agree with the hearing officer's decision to [find] them both guilty of fighting?

A. No, ma'am I didn't.

Q. But it wasn't your call, was it?

A. No, ma'am.

Q. Officer, would the hearing examiner have opportunity to see confidential informant statements,

29

> medical records, other records that perhaps you did not
> present to him?
>
> A.   Yes, ma'am.

Draft Transcript of Hearing Held on February 20, 2004.  After
that exchange, the Court found that the defendants had opened the
door on the confidential statements by putting into evidence that
the hearing officer's judgment, based on statements not before
the Court, should be preferred to Lt. Thibeault's testimony.  The
Court ordered the defendants to file the confidential informant
statements with the Court by 5:00 p.m. on February 20, 2004.
Defendants requested, among other things, that the Court decline
to order production of the confidential informant statements to
Hopkins until after the Court completed its preliminary review of
the complaint.  The Court granted that request.

As of today's date, no confidential informant statements
have been filed.  Instead, defendants first filed an "Ex Parte
Objection to Production of Confidential Informant Statements
and/or any Information About the Confidential Informants"
(document no. 13).  Defendants argue that the Court's order would
be placing the lives of the confidential informants in danger,
and that the statements were not relevant to the plaintiff's

30

request for a preliminary injunction. However, defendants did submit four exhibits to their objection, which they assert was all of the information that they were able to recover within the time permitted by the Court:

> Exhibit A: NHDOC Disciplinary Report (for Hopkins) signed by Robert Leitner and dated 1/6/02; NHDOC Incident Report signed by Robert Leitner and dated 1/6/02; NHDOC Statement Form written by C.O. Bigue and dated 1/6/02;
>
> Exhibit B: NHDOC Disciplinary Report (for McAuley);
>
> Exhibit C: Cassette tape recording of Inmate McAuley's disciplinary hearing dated 1/17/02;
>
> Exhibit D: Inmate History by Cell/Date for Hopkins.

None of these exhibits identify the purported confidential informants. In fact, defendants have confirmed that they do not have any written statements from the confidential informants, and that if there ever were any such statements only former Corrections Officer Jason Bigue, now inmate Bigue,[9] can identify them. Dfs.' Obj. at 4-5.

Notwithstanding that they do not have any confidential informant statements, defendants argue that the plaintiff is not

_____

[9]Defendants confirm that C.O. Bigue was terminated by NHDOC for providing contraband (tobacco) to inmates. Bigue was also criminally prosecuted and convicted on January 30, 2004. Df. Obj. at 5; see also Testimony of Jane Coplan, Draft Transcript of Hearing Held on February 20, 2004.

entitled to learn the identities of the confidential informants who may have testified against him during disciplinary hearings. Dfs.' Obj. at 5. Defendants request that this Court withhold the information they provided from the plaintiff, or provide him only redacted copies. Defendants further request that in the event that the Court decides to provide Hopkins full or redacted copies of the submitted documents, this Court should stay it's order to permit review by Judge McAuliffe, or allow that the documents be delivered to Hopkins by the Office of the Attorney General during a business day so that the Office of the Attorney General can take unspecified steps to limit any resulting harm to other inmates.

Defendants' request is puzzling. It is unclear what the defendants would like the district judge to review as the defendants have represented that they do not have any confidential informant statements, and that there apparently never were any. The Court also finds that defendants' legal argument for keeping the submitted documents from the plaintiff is misplaced.

Defendants cite Wolff v. McDonnell, 418 U.S. 539, 565-568 (1974), for the proposition that the plaintiff is not entitled to

learn the identities of the confidential informants who testified against him during disciplinary proceedings. Dfs.' Obj. at 5-6. That is an overbroad reading of <u>Wolff</u>. One of the issues in <u>Wolff</u> was whether disciplinary proceedings violate an inmate's right to due process when the inmate is denied disclosure of the identity of his accusers. The Court deferred to the discretion of prison officials in protecting identities in <u>disciplinary proceedings</u>. It did not find that the identities were unavailable in appropriate circumstances in § 1983 cases.

While plaintiff may have been appropriately denied access to the identities of the confidential informants in his disciplinary proceedings, that does not mean that those identities must be kept from the plaintiff in this court's proceedings. Here, the defendants have asserted that the hearing officer's conclusion was better than that of Lt. Thibeault because the hearing officer had access to three confidential informant statements. Therefore, the defendants imply that the hearing officer's conclusion that the plaintiff was engaged in mutual combat, as opposed to having been set up for a beating, should be accepted by this court. By advancing this claim, the defendants put the reliability of confidential informants at issue in a case pending

33

in federal court. That is quite a different matter than whether due process in the plaintiff's disciplinary hearing required disclosure. This Court does not accept secret evidence in any form.

It is clear that the defendants' objection and exhibits were not filed ex parte to protect the identities of the confidential informants since none of the informants are identified or even identifiable. What is clear instead, however, is that no one other than C.O. Bigue, who was caught, and ultimately convicted of, distributing contraband in the prison provided the statements that were relied upon by the hearings officer. This raises serious doubt about the reliability of the purported informants. Defendants' recognize the force of this inference in their objection. See Dfs.' Obj. at 6.

Having completed a preliminary review of Hopkins' complaint, the Court finds that the exhibits submitted with the defendants' objection are relevant to the underlying issue of whether Hopkins engaged in a one-on-one fight or was, as he alleges, assaulted by other inmates. In turn, that issue is relevant to the decision on the merits of Hopkins' § 1983 claims against the defendants for the failure to take reasonable steps to ensure his safety,

34

and to Hopkins' state tort claims against defendant Turcott. Accordingly, I overrule defendants' objection to the production of the exhibits based on relevance and the Supreme Court's holding in Wolff.

2. Motion To Provide C.I. Identities

Subsequent to defendants' objection, defendants filed a motion to provide the Court with the identities of the confidential informants and a motion to seal the motion to provide the Court with the identities the confidential informants (see unmarked documents submitted with document no. 18). In these motions, defendants now claim that [redacted] was a fourth "confidential informant" and they identify [redacted] as the three confidential informants who gave statements to C.O. Bigue.

Defendants allege that C.O. Bigue summarized the statements of the confidential informants in his own written statement provided to the hearing officer. Defendants further allege, on information and belief, that C.O. Bigue did not himself testify at Hopkins' disciplinary hearing because "revealing his own identity would risk the constructive identification of his informants."

35

Reviewing all of the documents submitted in response to this Court's February 20, 2004 Order, the Court finds that defendants' submissions demonstrate the following: [redacted] (2) none of the confidential informants relied upon by the hearing officer at Hopkins' disciplinary hearing testified at the hearing, (3) the hearing officer did not have any written statements from the three confidential informants identified by C.O. Bigue when he made his decision, (4) C.O. Bigue did not testify, and was not examined by the hearings officer, and (5) C.O. Bigue has since been terminated by NHDOC and prosecuted for engaging in the very criminal conduct of which Hopkins was suspicious. The plaintiff clearly has a very strong argument that the hearing officer's finding that Hopkins was engaged in a mutual fight has no credibility. And frankly, the Court is shocked by the lack of basic fairness in Hopkins' disciplinary proceeding and the restitution ordered.[10]

_____

[10]Although the Court recognizes that it does not have the authority to reverse the prison's disciplinary finding against Hopkins, Hopkins may amend his complaint in this action to include the disciplinary hearing as part of the retaliation against him.

In light of the Court's finding during the preliminary injunction hearing that the defendants opened the door on the confidential informant statements, and having considered the defendants' ex parte submissions, the defendants are ordered to provide Hopkins within ten business days unredacted copies of the ex parte objection and exhibits submitted therewith, a copy of the motion to provide the court with the identities of the confidential informants, and a copy of the motion to seal the motion to provide the court with the identities of the confidential informants (see unmarked documents submitted with document no. 18).

B.   Hopkins' Medical Records

In response to this Court's order, issued orally from the bench during the preliminary injunction hearing, Defendants filed a motion to provide Hopkins' updated medical records (document no. 15). Defendants have also filed a motion to seal those medical records (document no. 16). Those motions are granted.

## Conclusion

For the reasons set forth above, I find that the plaintiff has adequately stated a § 1983 retaliation claim and state tort claims for assault and battery against defendant Turcott. I find

37

that plaintiff has adequately stated § 1983 claims based on failure to take reasonable steps to ensure his safety against defendants Lunderville, Nihan, Coplan, Stanley, LaFlamme, Desmond and Thibeault. And I find that the plaintiff has adequately stated a § 1983 claim against defendant Edsel based on intentional indifference to a serious medical need.[11] I recommend that defendant Topham, and all of Hopkins' remaining claims against the other defendants, be dismissed from this action.[12]

Defendants' motion to provide updated medical records (document no. 15), and motion to seal those medical records (document no. 16) are granted. Defendants' ex parte objection (document no. 13) is overruled. Defendant's motion to seal the ex parte objection (document no. 14), motion to provide the court with the identities of the confidential informants, and motion to

---

[11]In an order issued simultaneously with this report and recommendation, I direct that those claims be served on the appropriate defendants.

[12]If this Court's Report and Recommendation is approved, the claims that the Court has identified herein will be considered for all purposes to be the claims raised in the complaint. If the plaintiff disagrees with this Court's identification of the claims, plaintiff must do so by filing an objection within ten (10) days of receipt of this Report and Recommendation, or by properly moving to amend the complaint.

seal the motion to provide the court with the identities of the confidential informants (<u>see</u> unmarked documents submitted with document no. 18) are denied.

Any objections to this Court's Report and Recommendation must be filed within ten (10) days of receipt of this notice. Failure to file objections within the specified time waives the right to appeal the district court's order.  <u>See</u> <u>Unauthorized Practice of Law Comm. v. Gordon</u>, 979 F.2d 11, 13-14 (1st Cir. 1992); <u>United States v. Valencia-Copete</u>, 792 F.2d 4, 6 (1st Cir. 1986).


_____
James R. Muirhead
United States Magistrate Judge

Date: May 20, 2004

cc:  Kenneth Hopkins, <u>pro</u> <u>se</u>
     Mary E. Schwarzer, Esq.